UNITED STATES of America,
Plaintiff-Appellee,

v.

James L. HARPER, Defendant-Appellant.

No. 30324.

United States Court of Appeals,
Fifth Circuit.

Oct. 25, 1971.

John B. Farese, Ashland, Miss., Emory Walters, Ocilla, Ga., Peggy A. Jones, Ashland, Miss., for defendant-appellant.

H. M. Ray, U. S. Atty., Alfred E. Moreton, III, Asst. U. S. Atty., Oxford, Miss., for plaintiff-appellee.

Before WISDOM, Circuit Judge, DAVIS,* Judge, and GOLDBERG, Circuit Judge.

WISDOM, Circuit Judge:

James Laverne Harper was charged in a two-count indictment with the unlawful manufacture of methadone, a narcotic drug, in violation of 21 U.S.C. § 505, and the unlawful sale of the drug not in or from the original stamped package, in violation of 26 U.S.C. § 4704(a). He pleaded not guilty and stood trial by jury. At the close of the Government's case, the court granted Harper's motion for judgment of acquittal on Count Two. The jury then found Harper guilty as charged in Count One. The court sentenced him to serve a three-year term in an institution to be designated by the Attorney General.[1]

On appeal Harper presents a number of contentions, largely relating to the admissibility and sufficiency of the Government's evidence as to his sanity at the time he was alleged to have committed the offense. We affirm.

I.

Harper contends that the court erred in permitting Drs. Hubbert and Fain to testify in this case. In accordance with an order of the court both doctors examined Harper after his arrest to determine his competency to stand trial.[2]

---

* Hon. Oscar H. Davis, U. S. Court of Claims, sitting by designation.

1. Harper's motion for reduction or suspension of sentence and probation is now pending in the district court.

2. 18 U.S.C. § 4244 provides in pertinent part:

Whenever after arrest and prior to the imposition of sentence or prior to the expiration of any period of probation the United States Attorney has reasonable cause to believe that a person charged with an offense against the United States may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency of the accused, setting forth the ground for such belief with the trial court in which proceedings are pending. Upon such a motion or upon a similar motion in behalf of the accused, or upon its own motion, the

Harper argues that permitting them to testify in court about the nature of their examinations and their diagnoses violated the physician-patient privilege granted him by Mississippi law. See Mississippi Code of 1942, § 1697.

This contention is without merit. Rule 26 of the Federal Rules of Criminal Procedure states that in federal criminal trials the admissibility of evidence and the witnesses are to be governed by the principles of the common law, except as modified by Act of Congress. At common law there was no physician-patient privilege. See 8 Wigmore; Evidence § 2380; McCormick, Evidence § 101. And we know of no federal statute creating such a privilege.[3] Under controlling federal standards, therefore, the testimony of the two doctors was admissible. See United States v. Mancuso, 5 Cir. 1971, 444 F.2d 691; Ramer v. United States, 9 Cir. 1969, 411 F.2d 30, 39–40; United States v. Mullings, 2 Cir. 1966, 364 F.2d 173, 176 n. 3.

Moreover, in the circumstances of this case the Mississippi physician-patient privilege would not bar the testimony of Doctors Hubbert and Fain. The Mississippi statute declares privileged only those communications made to a physician "by a patient under his charge or by one seeking professional advice." Mississippi Code of 1942, § 1697. In several cases the Mississippi Supreme Court has held that the statute does not apply to a physician appointed by the court or by the prosecution to examine the defendant to determine whether he is mentally competent to stand trial. See Hopkins v. State, 212 Miss. 772, 55 So.2d 467 (1952); Keeton v. State, 175 Miss. 631, 167 So. 68 (1936); Norwood v. State, 158 Miss. 550, 130 So. 733 (1930). See also Hardy v. Riser, N.D.Miss.1970, 309

F.Supp. 1234, 1239. Thus even if we were to hold that state-created privileges apply in federal criminal trials, the testimony of the two doctors as to their court-ordered examinations would not violate the physician-patient privilege granted the defendant by Mississippi law.

## II.

Second, Harper argues that the court erred in permitting Drs. Hubbert and Fain to testify that they examined Harper under a court order to determine whether he was mentally competent to stand trial and that they found him to be mentally competent. The doctors' testimony, Harper argues, violates the spirit, if not the letter, of 18 U.S.C. § 4244. That section provides in part as follows:

A finding by the judge that the accused is mentally competent to stand trial shall in no way prejudice the accused in a plea of insanity as a defense to the crime charged; such finding shall not be introduced in evidence on that issue nor otherwise be brought to the notice of the jury.

Allowing the doctors to testify that they examined him pursuant to a court order violates the statute, Harper contends, because it is the express purpose of the statute to prevent the jury from learning that the court has ordered a mental examination.

We cannot agree. The only evidence ruled inadmissible by the above quoted section of the statute is the *trial judge's finding* that the accused is competent to stand trial. In this case neither Dr. Hubbert nor Dr. Fain mentioned that the trial court had found Harper competent to stand trial. Each testified merely that he had examined Harper and found him mentally competent at the time of the examination. Moreover, the

court shall cause the accused, whether or not previously admitted to bail, to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the court.

3. We note that the proposed federal rules of evidence would create a psychother-

apist-patient privilege. See Rule 504, Proposed Rules of Evidence for United States Courts and Magistrates, 51 F.R.D. 315, 366 (1971). The proposed privilege, however, also contains an exception for court-ordered mental examinations. *Id.*

doctors' only mention of the court's examination order came in brief response to the question, "How did you come to know Harper?" In these circumstances we conclude that the doctor's testimony did not violate 18 U.S.C. § 4244.[4] *See* Edmonds v. United States, 1969, 106 U.S. App.D.C. 373, 273 F.2d 108, 114 (en banc); Bailey v. United States, 1957, 101 U.S.App.D.C. 236, 248 F.2d 558, 560.

### III.

Third, Harper asserts that the court erred in allowing the Government to cross-examine the defense witness Dr. Little by reading to him or having the witness read excerpts from medical reports by Drs. Starry and Bell. These medical reports included the doctors' conclusions that Harper was not insane. Allowing those conclusions to be introduced into evidence in this manner, Harper contends, denied him his Sixth Amendment right to be confronted by the witnesses against him.[5]

There are of course cases—both in this circuit and in others—holding that expert opinions as to the sanity of the defendant contained in hospital records are not admissible to prove the truth of the matters contained therein. Such opinions may thus be received into evidence only when the expert who made the report is available for cross-examination. *See, e. g.,* Otney v. United States, 10 Cir. 1965, 340 F.2d 696, 699–700; Lyles v. United States, 1957, 103 U.S.App.D.C.

22, 254 F.2d 725, 731 (en banc); Mullican v. United States, 5 Cir. 1958, 252 F.2d 398, 404; England v. United States, 5 Cir. 1949, 174 F.2d 466, 468. In arguing that the court erred in permitting cross-examination of the defense witness Dr. Little through the use of the reports of Drs. Starry and Bell, Harper relies heavily on these cases. In the circumstances of this case, however, we deem them inapposite.

The Government did not attempt to offer the reports of Drs. Starry and Bell into evidence. On the contrary, the Government disclosed the nature and contents of the reports solely to impeach the testimony of the defense witness Dr. Little. Dr. Little had testified on direct examination that in his opinion from June 1968 to July 1969 Harper suffered from a mental disease or defect that rendered him incapable of appreciating the wrongfulness of his acts or conforming his conduct to the requirements of the law—i. e., he was legally insane.[6] On cross-examination the Government sought to ascertain how Dr. Little arrived at his conclusion. He was thus asked how many times he interviewed Harper, whether he had administered any psychological tests, and whether he had based his opinions on any other physicians' reports. In response to the last question, Dr. Little admitted that he had studied the reports of Drs. Miller, Starry, and Bell. Dr. Miller had also concluded that Harper lacked the mental

---

4. Harper also contends that the court erred in permitting Drs. Fain and Hubbert to testify as to statements made by Harper during the course of his examinations bearing on the issue of his guilt. Another sentence of 18 U.S.C. § 4244 rules inadmissible any such statements. We have diligently searched the record, however, and are unable to find any disclosures by the two doctors of any statements made by Harper concerning his guilt.

5. Harper also contends that the introduction into evidence of the reports of Drs. Starry and Bell violated the physician-patient privilege granted him by Mississippi law. For the reasons set out in Part I of this opinion, we conclude that this contention is without merit.

6. In Blake v. United States, 5 Cir. 1969, 407 F.2d 908, this Court *en banc* adopted the following definition of insanity for use in criminal cases where the defense of insanity is raised:

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

"(2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

*Id.* at 916.

capacity to be responsible for his acts during the period from June 1968 to July 1969. Drs. Starry and Bell, however, had concluded that although Harper suffered from emotional disturbances, he was not insane. The Government then disclosed to the jury the nature and contents of the reports of Drs. Starry and Bell and inquired whether there was anything in those reports that supported Dr. Little's conclusion. At that point the court instructed the jury that the reports of Drs. Starry and Bell were to be considered by them only in determining the weight to be given to the testimony of Dr. Little and were not to be considered as proof of the facts asserted therein. In its charge to the jury at the conclusion of the trial the court repeated that instruction.

We hold that this limited use by the Government of the medical reports of Drs. Starry and Bell did not violate Harper's Sixth Amendment right to be confronted by the witnesses against him.

■■ Although medical reports containing expert opinions as to the defendant's sanity may not be admitted directly into evidence, they may be used by other experts in arriving at a conclusion as to the defendant's sanity. *E. g.*, Jenkins v. United States, 1962, 113 U.S.App. D.C. 300, 307 F.2d 637 (en banc); Rule 703, Proposed Rules of Evidence for United States Courts and Magistrates, 51 F.R.D. 315, 404 (1971). And if an expert witness considers such reports in reaching his conclusions, it is open to both sides to question him about what weight he gave the reports and why. *See* Brown v. United States, 1967, 126 U.S.App.D.C. 134, 375 F.2d 310, 318; Smith v. United States, 1965, 122 U.S. App.D.C. 300, 353 F.2d 838, 842 & n. 7; Birdsell v. United States, 5 Cir. 1965, 346 F.2d 775, 779; Rule 705, Proposed Rules of Evidence for United States Courts and Magistrates, 51 F.R.D. 315, 406 (1971).

■ The reason for that rule is clear. The issue of the defendant's insanity, when raised as a defense to a criminal prosecution, is to be decided by the jury on the basis of all the evidence. Therefore, although expert opinion evidence on the issue cannot be arbitrarily ignored, it is not binding upon the jury. Rather it is only advisory in nature. Indeed, it is the jury's function to assess the credibility of the expert witnesses and the weight to be given to their testimony. Mims v. United States, 5 Cir. 1967, 375 F.2d 135, 140–143. In a case such as this, in which expert witnesses express different conclusions as to the defendant's mental condition at the time of the alleged offense, it is important that the jury know upon what facts the expert witness bases his conclusion. As we have said on several occasions, "expert opinion as to insanity rises no higher than the reasons upon which it is based." *E. g.*, Nagell v. United States, 5 Cir., 1968, 392 F.2d 934, 936.

■ Thus, where, as here, an expert witness bases his conclusion as to the defendant's sanity on reports of other physicians, it is entirely proper that the jury know which opinions he credited, which he rejected, and why. As long as the jury is instructed that such hearsay opinions are being introduced solely to test the credibility of the expert witness and not to prove the truth of the matters contained therein, the use of such opinions for that limited purpose does not violate the confrontation clause of the Sixth Amendment.

### IV.

Fourth, Harper contends that the district court erred in two particulars in its instructions to the jury on the issue of his sanity at the time of the alleged offense.

In its original instructions to the jury, the court charged as follows:

Unless and until reasonable doubt of his sanity appears, the law presumes the defendant sane, but whenever, from the evidence in the case, the jury has a reasonable doubt of his sanity, the defendant should be found insane.

Harper objected to that instruction on the ground that since he had presented "some evidence" of his insanity, the presumption of sanity vanished and should not have been mentioned to the jury. After deliberating for about an hour, the jury sent a written request to the trial judge for further instructions on the issue of insanity. Before re-instructing the jury, the judge, to satisfy Harper's objection, agreed to eliminate from his charge the above quoted sentence. Omitting that sentence, he repeated his original instructions to the jury. But he also added:

> Now, when the question of the mental capacity of a defendant is raised by the proof, then it becomes the burden and duty of the Government to prove beyond a reasonable doubt that he * * * was competent to commit the crime, if he committed such crime, during the period indicated.

Although he did not object at the time, Harper now contends that this instruction re-introduced into the charge the original error-mention of the presumption of sanity. In effect, he argues, this instruction requires the jury to determine first whether there was sufficient evidence to raise the issue before they could begin to consider the question of Harper's insanity.

As authority for his proposition Harper relies principally on Doyle v. United States, 9 Cir. 1966, 366 F.2d 394, and Otney v. United States, 10 Cir. 1965, 340 F.2d 696. In *Otney*, the court wrote:

> The sufficiency of the evidence to overcome the legal presumption of sanity was not within the province of the jury or of concern to it. It was, therefore, prejudicial error for the Court to submit this issue to the jury. Instead, the Court should have determined, as a matter of law, that the presumption of sanity no longer existed and accordingly instructed the jury that the defendant's mental competency to commit the offense was an essential element of the offense charged and the burden was upon the Government to

prove the defendant's criminal responsibility beyond a reasonable doubt.

340 F.2d at 698–699. *See also* Doyle v. United States, 9 Cir. 1966, 366 F.2d 394, 399–401; Davis v. United States, 10 Cir. 1966, 364 F.2d 572, 574.

*Doyle* and *Otney*, however, have found no support in this circuit. It is true that there are cases in this circuit holding that when the defendant introduces some evidence of his insanity at the time of the alleged offense, the presumption vanishes—in the sense that the Government must then prove the fact of the defendant's sanity, as it must prove any other element of the crime, beyond a reasonable doubt. *E. g.*, Brock v. United States, 5 Cir. 1967, 387 F.2d 254, 247; Mims v. United States, 5 Cir. 1967, 375 F.2d 135, 140. It is also true that whether the defendant has introduced sufficient evidence to create a jury issue on the question of insanity is a matter to be determined by the court. *E. g.*, Blake v. United States, 5 Cir. 1969, 407 F.2d 908, 911. But it does not necessarily follow from those principles that a trial court errs in merely mentioning to the jury the presumption of sanity in connection with its instructions on the Government's burden of proof.

Indeed, it appears to be the rule in this Circuit that even after the defendant introduces some evidence of his insanity, the presumption on sanity remains in the case and goes to the jury to be considered along with the other evidence of the defendant's sanity. For example, in Howard v. United States, 5 Cir. 1956, 232 F.2d 274 (en banc), the Court said,

> The rule is that, "If the whole evidence, *including that supplied by the presumption of sanity,* does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offense charged", Davis v. United States [1895, 160 U.S. 469, 488, 16 S.Ct. 353, 358, 40 L.Ed. 499].

232 F.2d at 276 (emphasis supplied); *see also* Hackworth v. United States, 5 Cir. 1967, 380 F.2d 19, 20; Brown v.

United States, 5 Cir. 1965, 351 F.2d 473, 499. A similar rule prevails in the District of Columbia Circuit. *See* Keys v. United States, 1965, 120 U.S.App.D.C. 343, 346 F.2d 824, 826 (Burger, J.). And if the jury is entitled to consider the presumption of sanity along with the other evidence of the defendant's sanity, it surely cannot be error for the court to instruct the jury on the presumption. To decide this case, however, we need not go so far; it is clear that in this case the court did not instruct the jury to consider the presumption of sanity along with the other evidence in the case.

■ Rather, the narrow point for decision in this case is whether the trial court erred in mentioning to the jury the presumption of sanity in connection with its instructions on the Government's burden of proof. We have found no case in this circuit in which a conviction has been reversed following such an instruction. And, indeed, in Blake v. United States, 5 Cir. 1969, 407 F.2d 908 (en banc), and Hackworth v. United States, 5 Cir. 1967, 380 F.2d 19, we explicitly approved jury instructions on the Government's burden of proof containing such references to the presumption of sanity. Moreover, we are not impressed with Harper's arguments as to the need for hiding the presumption of sanity from the jury. The Ninth Circuit in *Doyle* said that the "vice" inherent in any mention to the jury of the presumption of sanity is that the jury may confuse its function with that of the court and conclude that the defendant's sanity was not at issue in the case because he did not fulfill his burden of producing "some" evidence of his insanity. That appears to us—at least in the circumstances of this case—to be a wholly illusory fear. The jury in this case listened for three days to five doctors give their expert opinions as to Harper's mental condition. In closing arguments counsel for both sides stressed that the only real issue to be decided in the case was the defendant's sanity at the time of the alleged offense. The trial court properly concluded that Harper had presented sufficient evidence to create a jury issue as to his insanity. In its instructions to the jury the court carefully and correctly explained the Government's burden of proof on the issue, reasonable doubt, the legal definition of insanity, the value of expert testimony, and the jurors' roles as sole judges of the weight of the evidence. In these circumstances we cannot accept as substantial the danger that upon learning of the initial presumption of sanity in a criminal case the jury might conclude that Harper's sanity was not at issue in this case. Therefore we hold that the court did not err in briefly mentioning to the jury the presumption of sanity in connection with its explanation of the Government's burden of proof on the issue.

■ Harper also argues that a portion of the court's charge incorrectly placed the burden on him to prove beyond a reasonable doubt that he was insane. When the jury returned for further instructions on the insanity issue, the court said:

Now, if during this period of time in which he was engaged in the illegal manufacture of this drug, if you find, in fact, beyond a reasonable doubt that he was so engaged, as a result of mental disease or defect, he lacked substantial capacity to appreciate the wrongfulness of his conduct, or to conform his conduct to the requirements of the law, then he would not be responsible for criminal conduct during that period of time.

We conclude that this charge does not place the burden on the defendant to prove his insanity beyond a reasonable doubt. The phrase "if you find, in fact, beyond a reasonable doubt that he was so engaged" refer to the question whether Harper was actually manufacturing illegal drugs and not to the question whether at the time he was insane. Moreover, in other portions of the charge the court correctly placed the burden on the Government to prove beyond a reasonable doubt that Harper was sane at the time of the alleged offense. Finally, we note that Harper did not object at the

time the court gave the above quoted instruction. Accordingly, we cannot say that the court's phrasing of this instruction—which, although awkward perhaps, is nevertheless eminently correct—constitutes reversible error.

## V.

Fifth, Harper contends that the Government's evidence on the issue of his sanity at the time of the alleged offense was insufficient to support the jury verdict. Harper argues that the evidence he marshalled in support of his insanity was so overwhelming that the jury must necessarily have had a reasonable doubt that he was sane at the time of the alleged offense.

■ Upon a challenge to the sufficiency of the Government's evidence, we must sustain the verdict of guilty if there is substantial evidence, taking the view most favorable to the Government, to support it. United States v. Glasser, 1944, 315 U.S. 60, 80, 86 L.Ed. 680, 704, 62 S.Ct. 457. "Substantial evidence" in this context means evidence that a reasonably minded jury could accept as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt. United States v. Barfield, 5 Cir. 1971, 447 F.2d 85; United States v. Reid, 5 Cir. 1971, 441 F.2d 1089; United States v. Warner, 5 Cir. 1971, 441 F.2d 821.

There was a considerable amount of evidence introduced at the trial bearing on Harper's mental condition during the period from June 1968 to July 1969, the time of the alleged offense. Dr. John B. Zeigler was Harper's first witness. Dr. Zeigler was medical director at W. R. Grace & Co. in Clarksville, Maryland, where Harper had been employed until July 1968. Dr. Zeigler had no special training in psychiatry or psychology and was primarily concerned with the physical health of W. R. Grace & Co. employees. In October 1967 Dr. Zeigler began treating Harper for various psychosomatic complaints. When Harper did not respond to the usual medications, Dr. Zeigler suggested that he see a psychia-

trist, which he did. Dr. Zeigler also prescribed the use of dexamyl, a barbiturate, to combat depression; however, when after several days Harper showed no improvement, he refused to refill the prescription. Toward the end of Harper's tenure with W. R. Grace & Co., Dr. Zeigler began to receive reports that Harper was becoming inefficient in his work. From these reports, his own observations, and his interviews with Harper, he finally concluded that because of family problems Harper was "emotionally disturbed." It was only because Harper informed him that he was leaving W. R. Grace & Co. that Dr. Zeigler did not report Harper's condition to company officials. On cross-examination, however, Dr. Zeigler admitted that Harper's symptoms did not indicate psychosis or insanity.

Dr. Peter Miller was a clinical psychologist who examined Harper on one occasion approximately three months after his arrest. His three-hour session with Harper consisted of obtaining historical information from the defendant himself and administering two basic psychological tests, the Minnesota Multiphasic Personality Inventory and the Rorschach inkblot tests. From his interview with Harper and the results of the tests, Dr. Miller diagnosed the defendant as suffering from paranoid schizophrenia, as a result of which he lacked the mental capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. Moreover, this condition, Dr. Miller believed, had existed over a long period of time.

On cross-examination Dr. Miller revealed that he had received his Ph.D. only a year before he examined Harper and that Harper was the first criminal defendant that he had examined. He stated that his diagnosis was based solely on the information he obtained from Harper, the test results, and his observations of Harper's behavior during the three-hour session. Dr. Miller described a paranoid schizophrenic as one who is highly suspicious, oversensitive in his relations with others, confused, out of con-

tact with reality, and suffering from delusions or hallucinations. As an example of Harper's delusional thinking, Dr. Miller pointed to Harper's statement to him that he believed he would be doing a great service to humanity by manufacturing methadone and he expected to be rewarded by society for his efforts in this area. Dr. Miller admitted, however, that he did not attempt to learn whether Harper was telling him the truth; he merely accepted as facts Harper's statements during the interview. Dr. Miller also admitted that except for the extreme loss of contact with reality—evidenced by Harper's delusional thinking—Harper's behavior was equally consistent with that of a schizoid personality, one who although emotionally disturbed is nevertheless legally responsible for his actions.

Dr. Tom F. Little was a medical doctor specializing in psychosomatic medicine. He interviewed Harper eight times beginning in December 1969—six months after Harper's arrest—for periods of thirty minutes to an hour. From Harper Dr. Little obtained a medical history. Based on that history Dr. Little concluded that throughout the period from June 1968 to July 1969 Harper had been a paranoid schizophrenic. As evidence of that mental disease Dr. Little noted that Harper was obsessed with the idea that by manufacturing methadone he would be helping narcotics addicts withdraw from stronger drugs. In Dr. Little's opinion, as a result of this mental disease, Harper lacked the capacity to appreciate the wrongfulness of his acts or to conform his conduct to the requirements of the law.

When cross-examined by the Government, Dr. Little freely admitted that he was not a psychiatrist or a psychologist. Also, for proof of the defendant's delusions he relied solely on the defendant's own statements during the interviews. He further stated that he did not administer to Harper any psychological tests. Moreover, he admitted that he had read the diagnoses of Drs. Miller, Starry, Bell, and Fain and that only the diagnosis of

Dr. Miller agreed with his. Nevertheless, he re-affirmed his opinion that Harper suffered from paranoid schizophrenia.

Dr. Robert Bornton Smith was a Presbyterian minister who visited frequently in Harper's home from January, 1969 until Harper's arrest in June 1969. Dr. Smith testified that until January 1969 Harper had seemed normal. Then Harper and his wife began having marital problems, and Dr. Smith suspected that he needed psychiatric care. During the spring of 1969 Dr. Smith observed a gradual breakdown in Harper's physical and mental capabilities. During one visit to Harper's home, the defendant admitted to Dr. Smith that he was taking drugs; however, he never mentioned his work or his view that he was helping mankind by manufacturing methadone. From his observations Dr. Smith concluded that during the spring of 1969 Harper lacked the capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

In addition to attempting to discredit Harper's expert and lay witnesses, the Government introduced its own witnesses on the issue of Harper's insanity. First the Government brought forward a series of lay witnesses who testified generally that Harper had been a highly valued employee at W. R. Grace & Co. and that his performance on the job was better than average—inferentially rebutting the testimony of Dr. Zeigler. There was also testimony concerning his frequent purchases throughout the period in question of the chemicals and supplies necessary to manufacture methadone—the inference being that Harper's mind was not so disordered that he could not logically plan his illegal activities. Finally, the Government sought to show through its lay witnesses that when Harper set up his laboratory in Tupelo, Mississippi, to manufacture methadone, he attempted to keep his work secret, which tended to rebut Harper's contention that he honestly believed that he was engaged in a socially useful and praiseworthy activity.

The Government also introduced two expert witnesses on the question of Harper's mental condition. Dr. Charles Hubbert was a psychiatrist who examined Harper in September 1969 for approximately forty-five minutes. As a result of his interview he concluded that Harper was then and had been during the period from June 1968 to July 1969 emotionally disturbed but not insane. Specifically, he found no evidence of paranoid schizophrenia. Between the time of his examination and the time of the trial, Dr. Hubbert examined the reports of Drs. Miller, Bell, Starry, and Fain. On the basis of those reports and his interview Dr. Hubbert concluded that during the period in question Harper possessed sufficient mental capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law.

Dr. Harold B. Fain was a psychiatrist at the United States Medical Center for Federal Prisoners at Springfield, Missouri. He examined Harper shortly after his arrest over a period of several days. Based on his interviews and extensive tests, Dr. Fain diagnosed Harper's case as "a situational depressive reaction and schizoid personality, associapathic trend". These findings, he explained indicate merely a personality disorder rather than psychosis or insanity. Like Dr. Hubbert, Dr. Fain found no evidence of paranoid schizophrenia. He therefore concluded that at that time—some two or three weeks after his arrest—Harper possessed the mental capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law. Nevertheless, on the ground that the question could be best answered by those who had observed him then, Dr. Fain would not say whether he believed that Harper had been sane during the period from June 1968 to July 1969.

The only other witness whose testimony bore on the issue of Harper's insanity was the defendant himself. Taking the stand after Drs. Zeigler, Miller, and Smith, Harper recited generally facts concerning his background, marital problems, need for money, introduction to methadone, "delusion" about his work, method of production and distribution of the methadone, and general physical and mental deterioration from June 1968 to July 1969. Many of these facts of course had been related by other witnesses, but in hearing and seeing Harper testify the jury was able to observe his demeanor, assess the credibility of his verbal responses, and weigh the conflicting expert opinions as to his mental condition. Although the expert witnesses differed as to the diagnosis, all who examined Harper agreed that while on trial he was in essentially the same mental condition as when they had examined him.

■ This Court has consistently held that the issue of the defendant's sanity, when raised as a defense to a criminal prosecution, is a question for the trier of fact, to be determined from all the evidence. *See, e. g.,* United States v. O'Neal, 5 Cir. 1970, 431 F.2d 695, 696; United States v. Pitts, 5 Cir. 1970, 428 F.2d 534, 537; Mims v. United States, 5 Cir. 1967, 375 F.2d 135, 143. In order to take the issue out of the jury's hands, it is not enough that the defendant introduce the opinion testimony of expert witnesses that he was insane at the time of the alleged offense. As we said in *Mims,* "questions of the *credibility* and *weight* of expert opinion testimony are for the trier of facts, and * * * such testimony is ordinarily not conclusive even where it is uncontradicted." 375 F.2d at 140. Of course, we have reversed convictions when the Government did not come forward with sufficient evidence to rebut the defendant's expert witnesses. *See, e. g.,* Bishop v. United States, 5 Cir. 1968, 394 F.2d 500; Nagell v. United States, 5 Cir. 1968, 392 F.2d 934; Brock v. United States, 5 Cir. 1967, 387 F.2d 254. Nevertheless, although reversing those convictions, we stressed that "each [case] must be decided upon its own facts with careful attention to the weight of the evidence on each side." Nagell v. United States, 5 Cir. 1968, 392 F.2d 934,

937; Brock v. United States, 5 Cir 1967, 387 F.2d 254, 258.

In this case both Harper and the Government introduced expert testimony on the question of his mental condition during the period from June 1968 to July 1969. Harper's witnesses generally concluded that he was then and is now suffering from paranoid schizophrenia, as a result of which he was not legally responsible for his actions. The Government's experts concluded that although emotionally disturbed Harper was not then and is not now suffering from any mental defect or disease. There were of course weaknesses in all the experts' testimony. For example, one of the Government's witnesses examined Harper only once for about forty-five minutes. The other Government witness, although he had found Harper sane in July 1969, would not say, out of all fairness to the defendant, whether he believed that Harper had been sane during the period in question. On the other hand, Harper put no psychiatrist on the stand; only one of Harper's witnesses was a psychologist; the others were medical doctors. One of the medical doctors admitted that when he examined him in early 1968 Harper was not then insane. None of the experts actually examined Harper during the period from June 1968 to July 1969, the time of the alleged offense. Moreover, all of them relied for their diagnoses—some to a greater extent than others—on statements made to them by Harper himself. This last point is important because during the trial Harper took the stand and testified to the same facts that he had supplied the expert witnesses and upon which they based their opinions as to his mental condition. Thus the jury was in the position of being able to evaluate for themselves the experts' conclusions. *See* United States v. Ingman, 9 Cir. 1970, 426 F.2d 973, 977. In the end the jury resolved the conflicting inferences against the defendant and concluded that Harper had been sane during the period from June 1968 to July 1969. We hold that substantial evidence—including the ex-

pert opinion testimony and the defendant's own testimony—supports that conclusion.

## VI.

Sixth, Harper contends that the court erred in admitting the evidence found in his laboratory on the ground that federal officers executed the search warrant in violation of Rule 41 of the Federal Rules of Criminal Procedure.

Rule 41(c) states that a federal search warrant "shall command the officer to search forthwith the person or place named for the property specified." Rule 41(d) further states that the warrant "may be executed and returned only within 10 days after its date". The search warrant in this case was issued on June 11, 1969, and executed on June 20. Return was made on June 21. Despite the fact that the search warrant was executed within ten days, Harper contends that the warrant was not executed "forthwith," that there was no justification for the delay, and that he was prejudiced as a result of the delay. Therefore, he concludes, the trial court should not have admitted the evidence discovered during the search of his laboratory. We cannot agree with this conclusion.

In United States v. Bradley, 5 Cir. 1970, 428 F.2d 1013, this Court interpreted Rule 41 to require the execution of a search warrant within a reasonable time, not exceeding ten days. What is a reasonable time will of course depend on the facts and circumstances of each case. *Id; see also* Spinelli v. United States, 8 Cir. 1967, 382 F.2d 871, 885, rev'd on other grounds, 1969, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637. Moreover, even if federal officers have failed to execute the warrant within a reasonable time, the evidence seized will be excluded only if the delay resulted in legal prejudice to the defendant. United States v. Bradley, 5 Cir. 1970, 428 F.2d 1013, 1016; House v. United States, 1969, 134 U.S.App.D.C. 10, 411 F.2d 725, 728.

 As in *Bradley,* the trial judge in this case was apparently laboring under the misapprehension that execution of the search warrant anytime within ten days met the "forthwith" standard. Since the warrant was undeniably executed within ten days, he refused to hear evidence bearing on the reasonableness of any delay or prejudice to the defendant. Other evidence in the record, however, shows that the officers' delay in executing the warrant was not unreasonable.

During the course of the trial federal officers testified that from April 19 to June 20, when Harper was arrested, Harper's laboratory in Tupelo was under constant surveillance. Harper's accomplices in Baltimore were also under surveillance. On June 11, when the search warrant was issued, the officers knew that Harper was about to complete the manufacture of a batch of methadone and deliver it to his distributors in Baltimore. They were waiting to execute the search warrant until completion of the methadone and the final delivery arrangements. When they learned that the completed batch of methadone was to be delivered in Baltimore the next day, they moved to execute the warrant. As a result of this timing, they were able to arrest not only Harper but also his accomplices in Baltimore. Any earlier execution of the warrant and consequent interruption of communications between the conspirators may well have alerted the accomplices and allowed them to escape. Therefore, we conclude that in the particular circumstances of this case the search warrant was executed within the reasonable time allowed by Rule 41 and this Court's decision in *Bradley.* *Compare* United States v. Dunnings, 2 Cir. 1969, 425 F.2d 836, 840–841 (nine-day delay); United States v. Nepstead, 9 Cir. 1970, 424 F.2d 269, 271 (six-day delay).

## VII.

Seventh, Harper contends that the district court erred in denying his request for a jury instruction concerning entrapment.[7]

During the trial Harper continually sought to establish the extent of his wife's involvement in his arrest by federal officers. Thus it came out that in April 1969 Mrs. Harper, thinking that it would enable her husband to get medical and psychiatric care, informed federal agents that Harper was engaged in the illegal manufacture of methadone. In May she delivered to the agents two samples of the methadone. In the following weeks she kept in touch with the agents and ultimately reported to them that a large batch of methadone had been completed and final delivery arrangements made. Upon receiving her information, the agents executed their search warrant and arrested Harper and his accomplices.

At the trial Harper contended that his mental and physical deterioration was so complete by June 1969 that he was unable to complete the manufacture of his last batch of methadone. Indeed, he had altogether abandoned his intention of doing so. He testified that it was only through the encouragement and assist-

---

7. Harper's requested jury instruction number 18 reads as follows:

> The defendant asserts that he was a victim of entrapment as to the crime charged in the indictment.
>
> Where a person has no previous intent or purpose to violate the law, but is induced or persuaded by law enforcement officers or their agents to commit a crime he is a victim of entrapment, and the law as a matter of policy forbids his conviction in such a case.

> If the evidence in the case should leave the jury with a reasonable doubt whether the defendant had the previous intent or purpose to commit any offense of the character here charged, and did so only because he was induced or persuaded by some officer or agent of the Government, then the jury should acquit him.
>
> That the burden is upon the Government to prove beyond a reasonable doubt that the defendant in this case was not entrapped.

ance of his wife—who, without his knowledge, was cooperating with the Government—that he was able to complete the last batch. Because of the participation of a Government informer, i. e., his wife, in the manufacture of the final batch of methadone, Harper contends that he was entitled to present the issue of his entrapment to the jury.

 Harper overlooks, however, the fact that the indictment charges him with manufacturing methadone during a period from July 1, 1968, to June 20, 1969. At the trial Harper freely admitted that throughout the entire period he had in fact been engaged in the illegal production of methadone. Even if we consider Mrs. Harper a Government agent and accept as true Harper's allegations of her participation in the manufacture of the final batch of methadone, there was no evidence of any Government involvement in the crime charged before April 1969. And it is well-established that entrapment occurs only when the criminal design originates with Government officials' implanting in an otherwise innocent person's mind the disposition to commit the crime. *E.g.*, United States v. Groessel, 5 Cir. 1971, 440 F.2d 602. Therefore, the jury instruction that Harper requested—asserting that "he was a victim of entrapment as to the crime charged in the indictment"—was inaccurate, misleading, and wholly lacking in evidentiary support. The district court did not err in denying the request for the instruction. *See* Pierce v. United States, 5 Cir. 1969, 414 F.2d 163, 165–169.

### VIII.

Finally, Harper contends that the Government's whole case is tainted because its evidence was obtained in violation of the privilege for confidential communications between husband and wife.

 The federal courts recognize two distinct privileges arising out of the marital relationship. The first bars one spouse from testifying adversely to the other. *See* 2 C. Wright, Federal Practice & Procedure: Criminal § 405, at 84–88; Rule 505, Proposed Rules of Evidence for United States Courts and Magistrates, 51 F.R.D. 315, 369 (1971). We are not concerned with that privilege here, for Mrs. Harper was never called as a witness in this case. The second bars the testimony of one spouse as to confidential communications of the other. *See* Blau v. United States, 1951, 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306; 2 C. Wright, Federal Practice & Procedure: Criminal § 406, at 93–94.[8] It is of course the second privilege that Harper contends the Government violated in gathering evidence against him.

The difficulty with Harper's contention is that the privilege for confidential communications is a rule of evidence. It prescribes only the admission into evidence, either directly or indirectly, of confidential marital communications. In this case the Government did not call Mrs. Harper as a witness and elicit from her confidential statements made to her by Harper. Nor did the Government attempt to introduce into evidence any out-of-court disclosures by Mrs. Harper or any confidential writings from Harper to his wife. Indeed, the only use made by the Government of Mrs. Harper's statements was in the extra-judicial investigation of its case.

We have found no cases holding that the Government's evidence must be excluded because of participation by the defendant's wife in the gathering of that evidence. Indeed, in several tax fraud cases the courts have upheld the introduction into evidence of one spouse's tax records that were handed over to Government agents by the other spouse.

---

8. We note, however, that the proposed federal rules of evidence would abolish the privilege for confidential communications between spouses. *See* Rule 505, Proposed Rules of Evidence for United States Courts and Magistrates, 51 F.R.D. 315, 369–70 (1971).

*See, e. g.,* United States v. Mackiewicz, 2 Cir. 1968, 401 F.2d 219; United States v. Ashby, 5 Cir. 1957, 245 F.2d 684. One such case closely analogous to Harper's is United States v. Winfree, E.D.Pa. 1959, 170 F.Supp. 659. In *Winfree* the defendant moved to suppress the evidence obtained as a result of statements made by his wife to Government agents. The court denied the motion, noting that there is no

> federal case holding that judicial supervision of the administration of criminal justice in the federal courts requires federal agents to refrain from securing, in the extra-judicial investigation of federal crimes, information of this type from a witness who is incompetent to testify at a trial * * *.

170 F.Supp. at 660.

■ In cases other than tax fraud cases courts have also ruled admissible the fruits of a Government investigation aided in some way by the defendant's wife. For example, it is now settled that a wife may consent to the search of a house or automobile jointly owned or occupied by her and her husband. The fruit of such a search are admissible in a subsequent criminal prosecution against the husband. *See, e. g.,* United States v. Thompson, 5 Cir. 1970, 421 F.2d 373, 376; Roberts v. United States, 8 Cir. 1964, 332 F.2d 892. Analogizing from these cases, we conclude that the Government did not violate the privilege for confidential marital communications when it used Mrs. Harper's statements as basis for its investigation of Harper's illegal activities and did not attempt to introduce any such statements into evidence at Harper's trial.[9]

We have dealt individually with the major points Harper presents on appeal. He urges six more points of error, which are set out in the margin.[10] We have considered each of these additional contentions and conclude that they are without merit.

Therefore, the judgment of the district court is affirmed.

---

9. Moreover, in the circumstances of this case it is even doubtful that the privilege for confidential communications between spouses would prohibit the introduction of such statements at Harper's trial. The privilege generally applies only to communications, or at least to acts intended to be communicative. *E. g.,* Pereira v. United States, 1954, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435. The illegal manufacture of methadone would not seem to be the kind of communicative act the privilege seeks to protect. Also, disclosure of the information to third parties generally removes the communication from the protected class of "confidential communications." *Id.* In this case several persons in Baltimore also knew of Harper's confidential information. And Harper testified at the trial —in connection with his insanity defense —that he made no effort to keep the fact of his illegal activity secret.

10. Harper also contends that (1) the court erred in refusing to instruct the jury to disregard the evidence concerning Harper's bank deposits; (2) the court erred in refusing to quash the search warrant on the ground that the affidavit for the warrant was insufficient to demonstrate "probable cause"; (3) the inventory of items found in Harper's laboratory was made in violation of the law, as Harper was not present at the time; (4) the Government wrongfully refused to disclose the name of its informer; (5) the court erred in denying certain of Harper's motions; and (6) the court erred in refusing to allow Harper to develop fully the nature and extent of Mrs. Harper's participation in the Government's investigation and prosecution of the case.