**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Roosevelt CAMERON, a/k/a "Bud"
Cameron, Defendant-Appellant.**

No. 76-1777.

United States Court of Appeals,
Fifth Circuit.

July 28, 1977.

J. Stephen Salter, Birmingham, Ala. (court appointed), for defendant-appellant.

Wayman G. Sherrer, U. S. Atty., George C. Batcheler, Asst. U. S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before GOLDBERG, SIMPSON and FAY, Circuit Judges.

SIMPSON, Circuit Judge:

In January, 1976, Roosevelt (or Bud) Cameron was found guilty by a jury of two Dyer Act violations, (a) for interstate transportation of a stolen motor vehicle, knowing it to have been stolen, Title 18, U.S. Code, § 2312, and (b) for receiving, concealing, storing, bartering, selling and disposing of a stolen motor vehicle moving as, or a part of, interstate commerce, knowing the same to have been stolen, Title 18, U.S.

Code, § 2313. After denying a motion for new trial the court adjudged him guilty and sentenced him to concurrent three year terms of confinement. Leave was granted him to appeal in forma pauperis and this appeal followed. We affirm.

## I. THE RELEVANT FACTS

At the trial, neither the stolen character of the single vehicle involved, a 1968 Buick Electra, nor its recent movement in interstate commerce from Saginaw, Michigan, to Tuscaloosa, Alabama, nor that it was in Cameron's possession in Tuscaloosa shortly after it was stolen in Michigan, were seriously disputed. The defense centered, as to both counts, on the defendant's asserted lack of knowledge that the Buick was stolen, and further as to Count Two, on denial that he *knowingly, feloniously* and *unlawfully* received, concealed, stored, bartered, sold or disposed of the vehicle.[1] The defendant's testimony was the main support for these defenses. The government relied on the theory that Cameron's possession of recently stolen property warranted an inference of his guilty knowledge of its stolen character,[2] and called as a witness the defendant's wife, who testified to his possession of the stolen vehicle in Alabama shortly after the theft. She further testified that appellant, then living with her but not married to her, moved across town as soon as he learned that the Buick had been picked up on the street by the Federal Bureau of Investigation. Her testimony was thus also supportive of the government's reliance on an inference of guilty knowledge as shown by flight and avoidance.

The marriage occurred a few days after the incidents described in the wife's testimony, detailed below. The marriage rela-

---

**1.** The italicized language appeared in Count Two, although it is not a part of § 2313. That section in its entirety provides only: Whoever receives, conceals, stores, barters, sells, or disposes of any motor vehicle or aircraft, moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

**2.** See, e. g., *Hale v. United States,* 410 F.2d 147, 150 (5th Cir. 1969), and cases assembled in Note 6, page 150. See also, *United States v. Fisher,* 500 F.2d 683 (5th Cir. 1974); *United States v. Martinez,* 466 F.2d 679–688 (5th Cir. 1972); *United States v. Robertson,* 417 F.2d 873, 877 (5th Cir. 1969).

tionship was a sordid and stormy one, and the couple by the time of trial were separated, probably permanently.[3]

When the government called the wife, Gloria Willis Cameron, to the stand the trial judge, in response to objection by defense counsel, expressed the view that she could not be compelled to testify as to any communication between her and her husband, assuming the existence of a valid marriage. The date of the marriage was established as April 14, 1975, a few weeks after the events charged in the indictment,[4] and its continued existence was also brought out, all in a preliminary voir dire of the witness by defense counsel, out of the jury's presence. The witness stated that she would testify if so instructed by the court, but that if she had the option not to testify, she would not.

The judge ruled that the government was free to call the witness, that objections would be sustained to questions as to communications between the witness and her husband, confidential or otherwise, but that objective facts could be brought out from the witness.[5]

Gloria testified in substance on direct examination: that she first knew Cameron in early March, 1975, when he showed up in Tuscaloosa at the rooming house where she lived, 2900 17th Street, in the company of her uncle, Roy Dell Hopkins; that the two men stayed three or four or five days and left; that Cameron returned alone about two and one-half weeks later and again took up residence in a room at 2900 17th Street; that on the latter occasion he brought a suitcase and clothing and was traveling in the maroon and white Buick with a Michigan license tag; that she assumed the car was his; that he drove the Buick from the time he arrived, in March, until April 14, 1975 (the wedding date), and thereafter exercised control and ownership

over the car; that sometime in May, while Cameron was absent, the police (or the FBI) had the car pulled off or picked up; that immediately thereafter she and Cameron moved to Northport with her father for about a week, and that Cameron made no effort to find out the reason the car was removed, or to retrieve some personal belongings he had left in it. She said that Cameron soon thereafter returned to Michigan. The court sustained an objection to a question as to whether or not the defendant made any statement to her prior to April 14, 1975, about where he obtained the car and how it came into his possession.

On cross-examination, Gloria testified that Cameron took the car to work every day, driving it all over town and making no attempt to conceal it; that the Michigan license plate remained on the car and that she never saw Bud make any attempt to change the little number on the windshield or on the door stop; and that he did not paint the car or alter it in any way. On re-direct examination she stated that Bud was in Saginaw, Michigan, in the interval between his first visit and the second time he returned to Tuscaloosa.

By motion for new trial, the appellant preserved for appellate review the court's claimed error in admitting the testimony of Gloria Willis Cameron over objection, on the ground that at the time of her testimony she was lawfully married to the appellant and that she stated she did not desire to testify.

This asserted ground of error is the principal question raised on appeal, but two additional grounds are urged, both properly preserved for our review by immediate objection, renewed by the motion for new trial: (a) the court's failure to instruct the jury that conviction for the crimes charged in the indictment requires proof beyond a

---

3. Except for the wife's visiting Cameron once in Michigan, they lived together only two weeks after the marriage and in the year between its date and the trial Cameron cohabited the remainder of that time with a former girl friend, who in the interim gave birth to a child.

4. "[O]n or about March 10, 1975".

5. In addition to the voir dire examination out of the jury's presence described in the text, the trial court conducted a post trial evidentiary hearing as to the circumstances surrounding the marriage, as an aid to ruling on the new trial motion.

reasonable doubt that the defendant acted "wilfully" with specific intent, and (b) error by the court in charging the jury, in substance, that the law presumes that the defendant intended the natural consequences of his acts. We discuss these latter grounds first.

## II. THE CHARGE TO THE JURY

■ Appellant contends that the trial court erred in failing to adequately instruct the jury on the element of specific intent. Appellant argues that the charge limited the factual issue to intent without fully defining or explaining the "wilfulness" element. The wording used by the court was:

> The issue you must decide arises under the second element of the offense which is doing such act or acts wilfully and with knowledge that the motor vehicle had been stolen. That is the issue for decision by you in this case.

Record, V. II, p. 194.

In *United States v. Mancuso,* 423 F.2d 23 (5th Cir. 1970), cert. denied, 400 U.S. 839, 91 S.Ct. 79, 27 L.Ed.2d 73, this Court upheld as proper instructions given as to a Dyer Act offense very similar to the instruction quoted in the text, *supra.* In both cases guilty knowledge at the time of transportation and possession was the only issue. We find no error in the instruction. See Mancuso, *id.* at 29.

■ Appellant further contends that the district court erred in instructing the jury in such a way as to lessen the government's burden of proof. Appellant does not contend that the burden of proof was shifted, as was the case in *Mann v. United States,* 319 F.2d 404 (5th Cir. 1963), cert. denied, 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d 474 (1964), but, rather, claims that the district court, after instructing the jury that they might infer intent from the objective acts of appellant, failed to clarify the specific intent required to constitute guilt of the crimes charged. Reading the charge as a whole, or focusing on that portion containing the alleged infirmity, it is clear that the burden of proof was never shifted from the government nor diluted in any ascertaina-

ble way. The charge is free from any flaws requiring reversal. See *United States v. Durham,* 512 F.2d 1281 (5th Cir. 1975), cert. denied, 423 U.S. 871, 96 S.Ct. 137, 46 L.Ed.2d 102.

## III. THE MARITAL PRIVILEGE

■ The federal courts recognize two distinct privileges based on the marital relationship. The first bars one spouse from testifying adversely to the other; the second bars testimony of one spouse as to confidential communications of the other. *United States v. Harper,* 450 F.2d 1032, 1045 (5th Cir. 1971). Our concern here is with the former, not the latter, type of privilege.

The Supreme Court observed in *Hawkins v. United States,* 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958):

> "The basic reason the law has refused to pit wife against husband or husband against wife in a trial where life or liberty is at stake was a belief that such a policy was necessary to foster family peace, not only for the benefit of husband, wife and children, but for the benefit of the public as well. . . . [T]here is still a widespread belief, grounded on present conditions, that the law should not force or encourage testimony which might alienate husband and wife, or further inflame existing domestic differences. Under these circumstances we are unable to subscribe to the idea that an exclusionary rule based on the persistent instincts of several centuries should now be abandoned. . . . [H]owever, this decision does not foreclose whatever changes in the rule may eventually be dictated by 'reason and experience'."

*Id.* at 77, 79, 79 S.Ct. 138, 139, 3 L.Ed.2d at 128, 129.

■ The exclusion of adverse testimony by a spouse is not an absolute privilege. There have been long recognized exceptions, such as exist in prosecutions for crimes committed by one spouse against the other or against the children of either; ac-

tions by one of the spouses against an outsider for an intentional injury to the marital relation; or in a criminal prosecution against one spouse in which a declaration of the other spouse made confidentially to the accused would tend to justify or reduce the grade of the offense. McCormick, Evidence, Section 85 (1972). See *Wolfe v. United States,* 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617 (1934); *Funk v. United States,* 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369 (1933). The Federal Rules of Evidence, Rule 501, recognizes no marital privilege per se, but rather recognizes a general privilege which "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

This reason and experience which the Supreme Court spoke of in *Wolfe, Hawkins,* and various other opinions, and which Congress refers to in Rule 501, places on the federal courts the responsibility of examining the policies behind the federal common law privileges so as to alter or amend them when reason and experience demand. If we are to fashion any exception in the case before us we must do so consistent with the rationale for the privilege. In the present case there were a number of factors which indicate that in spite of the legal existence of the marriage, as a social fact it had expired. There was no residence at which both spouses lived; there was a great disparity between the amount of time that the couple cohabited and the time that one or the other chose not to live together; the husband had a more permanent living arrangement with another partner than with his spouse and, indeed, fathered a child with that person. All these factors cumulatively signify a marriage that was moribund. If the marital privilege is intended to preserve domestic harmony—the most substantial argument that judges and writers today advance in support of it—it is apparent that the present case is not one in which the privilege would serve any such purpose.

We fashion no broad rule with our holding today as to when the marital privi-

lege should be disallowed. We decide narrowly on the facts as they appear before us. That is, where, as here, the spouse was called to testify only as to objective facts, with no questions allowed as to any communication between the spouses, and where the evidence supported a finding that the marriage was no longer viable and its members had little hope or desire for reconciliation, reason, experience and common sense indicate that the traditional policy reasons for the privilege are non-existent. It was properly disallowed.

AFFIRMED.