**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Arturo Reyes MENDOZA, June Bunch
Mendoza, and Oscar Reyes Mendoza,
Defendants-Appellants.**

No. 77–5142.

United States Court of Appeals,
Fifth Circuit.

June 16, 1978.

Lucien B. Campbell, Federal Public Defender, San Antonio, Tex., for A. Mendoza.

Edward C. Prado, Asst. Federal Public Defender, San Antonio, Tex., Robert Everett L. Looney, Austin, Tex. (Court-appointed), for J. Mendoza and O. Mendoza.

Jamie C. Boyd, U. S. Atty., LeRoy Morgan Jahn, James W. Kerr, Jr., Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before COWEN *, Senior Judge, GOLDBERG and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

Defendants-appellants Arturo Reyes Mendoza, June Bunch Mendoza, and Oscar Reyes Mendoza were indicted on one count of conspiracy to possess heroin with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846.[1] June Mendoza was also indicted on four counts of distributing heroin in violation of 21 U.S.C. § 841(a)(1), and Arturo Mendoza and Oscar Mendoza were indicted on two and three counts, respectively, of aiding and abetting the distribution of heroin in violation of 18 U.S.C. § 2 [2] and 21 U.S.C. § 841(a)(1). A jury convicted each defendant on all counts. The trial court sentenced Arturo Mendoza to 35 years' imprisonment with a special parole term of 30 years, June Mendoza to 40 years' imprisonment with a special parole term of 30 years, and Oscar Mendoza to 45

---

\* Senior Judge of the United States Court of Claims, sitting by designation.

1. 21 U.S.C. § 841(a)(1) provides:
 Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
 (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or
 21 U.S.C. § 846 provides:
 Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or

both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

2. 18 U.S.C. § 2 provides:
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

years' imprisonment with a special parole term of 30 years. Defendants now appeal, urging numerous contentions of reversible error. After carefully reviewing the record and considering all 23 of their contentions, we find that the defendants received a fair trial, and therefore affirm the convictions.

## I. The Facts

On August 4, 1976, Gene Young, a government informant, introduced Drug Enforcement Administration Agent Frank D. Balazs, who was working undercover, to defendant June Mendoza. Mrs. Mendoza drove Balazs by car to her residence in Corpus Christi, Texas, where she introduced him to her husband, defendant Arturo Mendoza. The Mendozas then discussed the possibility of selling large quantities of heroin, cocaine, and marijuana to Balazs. Subsequently, on four different occasions Mrs. Mendoza, with the assistance of her husband, Arturo Mendoza, and her brother-in-law, Oscar Mendoza, on three of these occasions, sold undercover DEA agents various quantities of heroin at the price of $25,000 a kilogram (2.2046 pounds). The first transaction, on August 5, 1976, involved approximately two ounces of heroin, the second transaction, on August 17, involved approximately one ounce of heroin, the third transaction, on August 18, involved approximately one kilogram of heroin, and the final transaction, on September 28, involved approximately twelve kilograms (approximately 26 pounds) of heroin. The Government's evidence at trial consisted almost exclusively of the testimony of the undercover DEA agents involved in the sales and of highly incriminating government tape recordings of conversations between the agents and the three defendants.

## II. The Tapes

Of their many objections, the Mendozas complain most often about the tapes used to convict them. The Government recorded these tapes, which, as previously noted, were of conversations about the sale of narcotics between the undercover agents and the defendants, by concealing a recording device on Agent Belazs' person and by attaching a similar device to the earpiece of telephones used by the agents to talk with the defendants. Congress, through Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, has sanctioned the use of such technology by law enforcement authorities in their fight against crime, provided the authorities comply with the provisions of the Act in doing so.

■ Defendants' first contention is that the Government did not seal the tapes under judicial direction and therefore violated 18 U.S.C. § 2518(8)(a), which provides:

> The contents of any wire or oral communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. The recording of the contents of any wire or oral communication under this subsection shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders. They shall not be destroyed except upon an order of the issuing or denying judge and in any event shall be kept for ten years. Duplicate recordings may be made for use or disclosure pursuant to the provisions of subsections (1) and (2) of section 2517 of this chapter for investigations. The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire or oral communication or evidence derived therefrom under subsection (3) of section 2517.

Thus, according to defendants, the trial court should have suppressed the tapes pursuant to 18 U.S.C. §§ 2515 and 2518(10)(a).[3]

---

**3.** 18 U.S.C. § 2515 provides:

Whenever any wire or oral communication has been intercepted, no part of the contents

of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in

The sealing requirement of Section 2518(8)(a), by the literal wording of the statute, pertains only to recordings made pursuant to a judicial order authorizing the interception of a wire or oral communication. *See* 18 U.S.C. §§ 2516, 2518(1)–(7) & (9), 2519. In this case judicial authorization to record the conversations was not necessary because the tapes were made with the consent of one of the parties to the conversations—in each case the undercover agent who was doing the taping. 18 U.S.C. § 2511(2)(c) provides that such consent renders lawful the interception of a wire or oral communication:

It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

In any event, Congress' primary purposes in legislating the sealing requirement were to safeguard recordings from editing or alteration, *United States v. Sklaroff*, 5 Cir., 506 F.2d 837, 840, *cert. denied*, 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975), and to maintain the confidentiality of recordings, *United States v. Abraham*, 6 Cir., 1976, 541 F.2d 624, 627–28. Both purposes were served with respect to the consensual recordings in this case. The Assistant United States Attorney questioned Agent Balazs at length as to the chain of custody and the authenticity of the tapes, and Balazs re-

sponded that the tapes had been in the continuous custody of the Drug Enforcement Administration since they were made and that no changes, additions, or deletions had been made to them. Defendants' contention is therefore without merit.

Defendants next assert that the tape of a telephone conversation between defendant June Mendoza and government informant Gene Young was inadmissible, *see* 18 U.S.C. §§ 2515 and 2518(10)(a), because the Government offered no proof that the recording was made pursuant to a court order, *see* 18 U.S.C. §§ 2516, 2518, 2519, or with the consent of one of the parties to the conversation, *see* 18 U.S.C. § 2511(2)(c). Defendants Arturo Mendoza and Oscar Mendoza lack standing to complain of the tape's admissibility because neither has a legitimate expectation of privacy either as a party to the conversation or through a possessory interest in the tape. *United States v. Juarez*, 5 Cir., 1978, 573 F.2d 267, 276, *quoting United States v. Ransom*, 5 Cir., 1975, 515 F.2d 885, 889, *cert. denied*, 424 U.S. 944, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976). Turning to the merits of Mrs. Mendoza's contention, the record is clear beyond question that DEA Agent John B. Brown, III provided Young with the necessary equipment to record conversations between himself and Mrs. Mendoza, that Young voluntarily recorded the conversation at issue between himself and Mrs. Mendoza, and that he then voluntarily

or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

18 U.S.C. § 2518(10)(a) provides:

Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval.

Such motion shall be made before the trial, hearing, or proceeding unless there was no opportunity to make such motion or the person was not aware of the grounds of the motion. If the motion is granted, the contents of the intercepted wire or oral communication, or evidence derived therefrom, shall be treated as having been obtained in violation of this chapter. The judge, upon the filing of such motion by the aggrieved person, may in his discretion make available to the aggrieved person or his counsel for inspection such portions of the intercepted communication or evidence derived therefrom as the judge determines to be in the interests of justice.

turned over the tape to Brown. The recording was in all respects consensual. *See United States v. Juarez, supra,* at 278.

■ Defendants also contend that the tapes were substantially inaudible and unintelligible, that the Government's transcripts of the tapes, which were provided to the jury for it to follow while the tapes were being played, were inaccurate, and that the trial court erroneously denied defendants' request for a continuance in order to prepare their own transcripts and prove the Government's inaccuracies. A review of the tapes indicates that portions of some of them are inaudible and unintelligible. This does not necessarily make them inadmissible, however. The rule in this Circuit is that tape recordings that are partially inaudible and/or unintelligible are not inadmissible unless these portions "are so substantial as to render the recording as a whole untrustworthy," a determination that "is left to the sound discretion of the trial judge." *United States v. Avila,* 5 Cir., 443 F.2d 792, 795–96, *cert. denied,* 404 U.S. 944, 92 S.Ct. 295, 30 L.Ed.2d 258 (1971). *See United States v. Juarez, supra,* at 278. We find no abuse of the trial court's discretion in this case in admitting the tapes.

■ Defendants' complaints as to the accuracy of the Government's transcripts and the trial court's denial of their request for a continuance are also meritless. In *United States v. Onori,* 5 Cir., 1976, 535 F.2d 938, a panel of this Court discussed the proper procedures to be followed by a trial court in admitting transcripts of tape recordings. We noted first that it is within the discretion of the trial court to allow the jury to use a transcript as an "aid" while listening to a tape. A transcript is often helpful to the jury, we observed, because portions of a tape may be inaudible (and presumably unintelligible, too) and because the jury may find it difficult to identify the speakers from the tape alone. When the trial court decides the use of a transcript is proper, "the first efforts of the district court should be to devise a 'stipulated' transcript, one to which all sides to the dispute can agree." If the parties cannot agree, each side may submit its own transcript and "the jury is entitled to consider the divergence in [the]

two transcripts of the same conversation, with the recording of it, as a problem of fact to be resolved in the traditional manner." In short, "it is unnecessary for the trial court to decide whether a transcript is accurate before that transcript is given to the jury, so long as each side to the dispute is given an opportunity to submit a transcript containing its version of a conversation." 535 F.2d at 947–48.

■ In the instant case defendants had ample opportunity before trial to prepare their own transcripts and demonstrate the Government's alleged inaccuracies, but they chose to let that opportunity pass. The Government provided copies of all the tapes to defendants prior to October 26, 1976, about three months before trial. The Government submitted all but one of its transcripts to defendants approximately one month before trial, and the final transcript was submitted fifteen days before trial. Yet defendants chose to wait until their trial had already begun to request a continuance to prepare their own transcripts in order to demonstrate the alleged inaccuracies in the Government's version of the tapes. In light of such dilatory conduct, and perhaps even gamesmanship, *cf. Wainwright v. Sykes,* 433 U.S. 72, 89–91, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977), the trial court did not abuse its discretion in denying defendants' motion for a continuance. *See Lopez v. Aransas County Independent School District,* 5 Cir., 1978, 570 F.2d 541 544; *United States v. Hegwood,* 5 Cir., 1977, 562 F.2d 946, 954; *United States v. Uptain,* 5 Cir., 1976, 531 F.2d 1281, 1285. Additionally, lest there be any doubt as to the total fairness accorded defendants by the trial court, we note that the Government introduced testimonial evidence that its transcripts were accurate, and that the trial court, in denying the motion for a continuance, instructed defendants' counsel that "if you have any evidence at the time that you put on your case that would dispute the accuracy of [the Government's] transcripts, I will permit you to show it." Defendants could show none. Further, the trial court repeatedly instructed the jury that the purpose of the transcripts was

merely to aid them while listening to the tapes; the tapes themselves, the jury was told, were the actual evidence. "[I]t is what you hear that counts and not what is on this paper . . . ," the trial court admonished. Defendants' contentions are accordingly without merit.

▮▮▮▮ The Mendozas' remaining objections concerning the tapes do not require extended discussion. The trial court did not err in *sustaining* defendant's objection to allowing the Government to submit the transcripts to the jury after it had begun deliberating.[4] Similarly, the trial court did not err in instructing defendants' counsel not to interrupt continuously the playing of the tapes with objections, because, the court said, the defendants' numerous prior objections to the tapes would be considered as having been made to all the tapes. Finally, the failure of the court reporter to transcribe into the written record the contents of the tapes as they were played to the jury did not prejudice defendants and does not constitute reversible error.

### III. The Marital Privilege

Defendant Arturo Mendoza contends that the admission into evidence of the taped coconspirator statements of his wife, June Mendoza, regarding his participation in the conspiracy violated the marital privilege whereby one spouse cannot be compelled to testify in the federal courts against the *other spouse over the objection of that* spouse. We disagree.

▮▮▮▮ Fed.R.Evid. 501 provides in part that the privilege of a witness or a person "shall be governed by the principles of the common law as they may be interpreted by the courts of the United·States in the light of reason and experience." One such privilege repeatedly recognized by common law principles is the marital privilege. *See Hawkins v. United States*, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 25 (1958). The marital

privilege actually represents two distinct privileges in the federal courts. The first bars one spouse from testifying adversely to the other. The second bars one spouse from testifying as to the confidential communications of the other. *United States v. Cameron*, 5 Cir., 1977, 556 F.2d 752, 755. Despite defendant's assertion to the contrary, we are concerned here only with the second type of marital privilege, because Mrs. Mendoza did not testify at trial against her defendant husband. The issue, then, is whether the playing·of the tapes constituted inadmissible testimony by Mrs. Mendoza as to Arturo Mendoza's confidential marital communications.[5]

In deciding this question, we begin with the observation that the Supreme Court has indicated its approval of the marital privilege in general. In *Hawkins v. United States, supra*, 358 U.S. at 77, 79, 79 S.Ct. at 138, 139, the Court stated:

> The basic reason the law has refused to pit wife against husband or husband against wife in a trial where life or liberty is at stake was a belief that such a policy was necessary to foster family peace, not only for the benefit of the husband, wife and children, but for the benefit of the public as well. Such a belief has never been unreasonable and is not now. . . . Under these circumstances we are unable to subscribe to the idea that an exclusionary rule based on the persistent instincts of several centuries should now be abandoned.

*See Wyatt v. United States*, 362 U.S. 525, 526, 80 S.Ct. 901, 902, 4 L.Ed.2d 931 (1960). Nonetheless, the Court went on to caution that its decision "does not foreclose whatever changes in the rule may eventually be dictated by 'reason and experience.'" 358 U.S. at 79, 79 S.Ct. at 139. A panel of this Court recently announced that "[t]his reason and experience which the Supreme

---

4. Strangely enough, defendants now argue that the court should have overruled their objection to the jury having the transcripts during its deliberations.

5. If the admission of the tapes did not violate the marital privilege protecting confidential

communications, the trial court properly admitted the tapes under Fed.R.Evid. 801(d)(2)(E), which provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. *See United States v. Ochoa*, 5 Cir., 1977, 564 F.2d 1155, 1156–68.

Court spoke of . . ., and which Congress refers to in [Fed.R.Evid.] 501, places on the federal courts the responsibility of examining the policies behind the federal common law privileges so as to alter or amend them when reason and experience demand." *United States v. Cameron, supra,* 556 F.2d at 756. We have no intention of altering or amending the marital privilege in the case before us, because, for reasons that will be discussed, the privilege is inapplicable. But we would be remiss if we did not observe that the call for the curtailment of both aspects of the privilege has risen from many quarters. One commentator is particularly harsh in his criticism:

> [A]ll privileges, in general, and this privilege for marital confidences in particular, are inept and clumsy devices to promote the policies they profess to serve, but are extremely effective as stumbling blocks to obstruct the attainment of justice. Accordingly the movement should be toward restriction, and not toward expansion, of these mechanisms for concealment of relevant facts.

*McCormick on Evidence* § 79, at 165 (2d ed. E. Cleary ed. 1972). Similarly, the Kentucky Supreme Court recently stated:

> At its very best, the rule that one party to a marriage cannot be compelled to testify against the other, codified in KRS 421.210, is one of the most ill-founded precepts to be found in the common law. It is enough that it continues to exist at all. When it is encountered it is better to be trimmed than enlarged.

*Wells v. Commonwealth,* 562 S.W.2d 622, 624 (Ky.Sup.Ct., 1978). Even the United States Supreme Court has stated with respect to privileges in general:

> Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth.

*United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974). *See, e. g.,* 8 *Wigmore on Evidence* § 2228, at 221 (rev. ed. J. McNaughton ed. 1961); Note, *Questioning the Marital Privilege: A Medieval Philosophy in a Modern World,* 7 *Cum.L.Rev.* 307, 318–22 (1976).

The marital privilege protecting confidential communications between spouses would be inapplicable to the taped declarations of June Mendoza in the Second and Seventh Circuits, because the confidential communications between the Mendozas about which Mrs. Mendoza spoke to the undercover DEA agents, and to which Arturo Mendoza now objects, pertained to Arturo Mendoza's participation in the conspiracy. In these two Circuits marital communications having to do with the commission of a crime and not with the privacy of the marriage itself do not fall within the privilege's protection. In *United States v. Kahn,* 7 Cir., 1972, 471 F.2d 191, *cert. denied,* 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 956 (1973) (cross-petition raising marital privilege issue), *rev'd on other grounds,* 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974), for example, the Seventh Circuit reversed the trial court's suppression of taped conversations between the husband and wife codefendants because the conversations concerned continuing violations by the codefendants of Illinois gambling laws. "Society has an interest in protecting the privacy of marriage because invasion of the privacy endangers the family relationship," stated the Court, but " '[w]here both spouses are substantial participants in patently illegal activity, even the most expansive of the marriage privileges should not prevent testimony.' " 471 F.2d at 194, *quoting* Note, *Future Crime or Tort Exception to Communications Privilege,* 77 *Harv.L.Rev.* 730, 734 (1964). The *Kahn* Court quoted from an earlier Seventh Circuit opinion, *United States v. Doughty,* 7 Cir., 1972, 460 F.2d 1360, 1364, in pointing out that admitting taped conversations of spouses about crimes in which both spouses participated would offend neither the family harmony nor the public interest of which the Supreme Court spoke so protectively in *Hawkins v. United States, supra. See United States v. Van Drunen,* 7 Cir., 501 F.2d 1393, 1396, *cert. denied,* 419 U.S. 1091, 95 S.Ct. 684, 42 L.Ed.2d 684 (1974); *United States v. Doughty, supra,* 460 F.2d at 1363–64. *See also United States v. Pugliese,* 2 Cir., 1945,

153 F.2d 497, 500. The Second Circuit adopted the rule of the Seventh Circuit in *United States v. Cotroni,* 2 Cir., 1975, 527 F.2d 708, 713, *cert. denied,* 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976).

 The approach in the Second and Seventh Circuits is, we believe, the proper one. In reaching this conclusion, we are mindful of the Supreme Court's command in *Hawkins v. United States, supra,* 358 U.S. at 79, 79 S.Ct. at 139, as well as of the congressional mandate in Fed.R.Evid. 501, to interpret the marital privilege in the light of reason and experience when applying it to new situations. This Court is mindful also of the Supreme Court's admonition in *United States v. Nixon, supra,* 418 U.S. at 710, 94 S.Ct. at 3108, to construe privileges narrowly. *See Ryan v. Commissioner of Internal Revenue,* 7 Cir., 1977, 568 F.2d 531, 542. Accordingly, we have weighed the need for truth against the importance of the policy sought to be furthered by the privilege, and considered the likelihood that recognizing the privilege in the factual setting of this case will in fact further that policy, and, if so, how much. *Ryan v. Commissioner of Internal Revenue, supra,* 568 F.2d at 543. The result is that this Court is now convinced that the rule of the Second and Seventh Circuits strikes the proper balance between domestic tranquility and the public interest therein, on the one hand, and the revelation of truth and

the attainment of justice, which also are in the public interest, on the other. Therefore, we hold that conversations between husband and wife about crimes in which they are jointly participating when the conversations occur are not marital communications for the purpose of the marital privilege, and thus do not fall within the privilege's protection of confidential marital communications.[6] Defendant's contention is therefore without merit.[7]

### IV. Other Contentions

 Defendants' other contentions are also meritless and require little discussion. The trial court did not abuse its discretion in declining to ask defendants' detailed, intrusive, and unnecessary voir dire questions about the prospective jurors' racial prejudice against Mexican-Americans and about their Mexican ancestry. The court asked whether any juror was biased for or against Mexican-Americans, and that was more than sufficient in this particular case where alienage was not an issue. The grand and petit jury selection process in the Western District of Texas complies with the Constitution and federal law. Count 1 of the indictment, alleging defendants' conspiracy, was neither duplicitous nor misleading nor too vague as to the time of the alleged crime. The trial court did not err in failing to read the indictment to the jury, because the jurors had a copy of the indict-

**6.** Note also that in this Circuit "[t]he general rule is that communications made by a client to his attorney during or before the commission of a crime or fraud for the purpose of being guided or assisted in its commission are not privileged." *Hyde Construction Co. v. Koehring Co.,* 5 Cir., 1972, 455 F.2d 337, 342. It is equally well settled in this Circuit that "the attorney-client privilege does not extend to communications regarding an intended crime." *United States v. Gordon-Nikkar,* 5 Cir., 1975, 518 F.2d 972, 975.

**7.** Arturo Mendoza points to *Ivey v. United States,* 5 Cir., 1965, 344 F.2d 770, as support for his assertion that the tapes were protected by the marital privilege even though June Mendoza's statements were about his participation in their criminal conspiracy. In *Ivey,* a panel of this Court held that an out-of-court statement made by defendant Ivey's wife to a customs agent, which corroborated Ivey's confession to aiding and abetting the importation of

heroin, was inadmissible because the agent's in-court testimony of Mrs. Ivey's statement violated the rule against admitting testimony of one spouse against another. *Ivey* is inapposite to the instant case for two reasons. First, the *Ivey* Court was careful to note that "there are more than the usual reasons for excluding [Mrs. Ivey's statement]." Two of those reasons, that the customs agent had Mrs. Ivey in custody *when she made the incriminating* statement and that she also was under the influence of heroin at the time, 344 F.2d at 772, are not present here. Second, as the Seventh Circuit observed in *United States v. Kahn, supra,* 471 F.2d at 195, *Ivey* is distinguishable because "the objectionable testimony of Mrs. Ivey did not deal with the furtherance of a crime, but with an admission of a past crime." For the same reason, *United States v. Williams,* 5 Cir., 1971, 477 F.2d 894, 897–98, is inapposite, as well.

ment during their deliberations. The trial court's jury instructions were, as a whole, consistent with the court's version that was submitted to the jury in written form upon defendants' request.

 The trial court, as it should have, submitted defendants' defense of coercion, duress, and entrapment to the jury. Agent Balazs' testimony as to what June Mendoza told him about Oscar Mendoza's heroin transactions in New York was admissible under Fed.R.Evid. 801(d)(2)(E), which removes such coconspirator's statements from the definition of hearsay. Moreover, the trial court gave proper *Apollo* jury instructions pertaining to the proper use of hearsay testimony in a conspiracy case. *Apollo v. United States,* 5 Cir., 1973, 476 F.2d 156, 162–64. The trial court did not err in allowing the Government to introduce Oscar Mendoza's prior felony conviction during the Government's presentation of its case to establish intent and thus rebut Mendoza's defense of coercion, duress, and entrapment. There was sufficient evidence for the jury to convict Arturo Mendoza on Count 5 of the indictment, which alleged that he aided and abetted the distribution of approximately twelve kilograms of heroin on September 28, 1976. The record also indicates that Arturo Mendoza's attorney performed competently before the trial court and before this Court. Mendoza was not, therefore, denied effective assistance of counsel.

Defendants' final two contentions, that the trial court erred in its application of Fed.R.Evid. 615, which pertains to excluding witnesses from the courtroom so they cannot hear the testimony of other witnesses, by permitting Agent Balazs to sit with the Government's counsel during trial, and that the trial court erred in admitting certain postarrest statements of June Mendoza, are not briefed. We find no merit in defendants' unsupported assertions.[8]

AFFIRMED.

GOLDBERG, Circuit Judge, specially concurring:

While agreeing with the majority's result and with its analysis of most of the issues raised on appeal, I am compelled to concur specially on the question of the marital privilege. The majority holds today that the privilege barring one spouse from testifying adversely to another is inapplicable in this case simply because Mrs. Mendoza did not testify at trial against her husband. Without explanation or citation of superseding authority, the majority thus discards the rule of *Ivey v. United States,* 344 F.2d 770 (5th Cir. 1965), as that rule has been understood by this court, see *United States v. Williams,* 447 F.2d 894, 897–98 (5th Cir. 1971), as well as others. See *United States v. Cleveland,* 477 F.2d 310, 313 (7th Cir. 1973); *United States v. Doughty,* 460 F.2d 1360, 1364 n.3 (7th Cir. 1972). See also 2 C. Wright, Federal Practice and Procedure § 405, at 87 n.25. Although I concur in the affirmance of Arturo Mendoza's conviction on harmless error grounds, I find myself bound by clear Fifth Circuit precedent.

The challenged testimony in the instant case was introduced through Agent Balazs who, working in an undercover capacity, had discussed the purchase of narcotics with the defendants.[1] Agent Balazs testified that in the course of arranging a heroin sale Mrs. Mendoza told him that her husband owned land in Mexico on which there was a cave in which was cached a large amount of heroin. Agent Balazs also testified that she told him that she and her husband were interested in establishing a Mexican curio shop in Corpus Christi. Their plan, she told the agent, was to smuggle heroin inside the curios. Appellant Arturo Mendoza, contends that the admission of this testimony violated the rule against admitting the testimony of one spouse against the other. He rests his claim of privilege upon *Ivey v. United States, supra.*

8. With respect to defendants' contention regarding Fed.R.Evid. 615, we note that this Court recently held that Rule 615 does not preclude the trial court from allowing a witness who is a representative of a party which is not a natural person, such as the Government, to remain in the courtroom. *United States v. Auten,* 5 Cir., 1978, 570 F.2d 1284.

1. Tape recordings of the same conversations were also introduced.

*Ivey,* like the case at bar, presented a claim of marital privilege. Miley, a government agent, testified at trial. A portion of his testimony related to an interview he had with Mrs. Ivey, the defendant's wife, while Mrs. Ivey was confined in the hospital subsequent to her arrest. Miley testified that Mrs. Ivey told him that "she and her husband had gone to Mexico to get a "fix," that each of them had received an injection of a portion of the heroin they purchased, and that what was found on her was the remainder." 344 F.2d at 771. The husband contended that the admission of Miley's testimony violated the rule against admitting the testimony of one spouse against another.[2] This court agreed and reversed the conviction. After discussing *Hawkins v. United States,* 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed. 125 (1958), in which the Supreme Court reaffirmed the common-law rule that a wife's testimony at trial was inadmissible against her husband, the *Ivey* court turned to the contention that the rule ought not be applicable when the wife's testimony was introduced solely through the mouth of a third person to whom the wife had made an out-of-court statement. Our response to that contention was both precise and unequivocal:

> The *Hawkins* case, supra, involved the admission of a wife's testimony in open court, but we know of no reason why the rule there reaffirmed is not equally applicable to a statement alleged to have been made by her out of court. She might as well be permitted to testify against her husband in open court as to permit the introduction of a statement she had made against him out of court.

Id. at 772.

That is the law in this circuit. In *United States v. Williams, supra,* we reviewed *Ivey* in closely analogous circumstances. There the government attempted to introduce through a law enforcement agent's testimony Mrs. Williams' out-of-court statement incriminating her husband. *Ivey* was read to reject any distinction between a statement made out-of-court and one made on the witness stand. 447 F.2d at 897.[3] Indeed, the Seventh Circuit, in drawing a distinction between in-court and out-of-court statements, was forced to admit that "testimony by a government agent as to what a spouse said would be inadmissible in the Fifth Circuit . . . ." *United States v. Cleveland,* 477 F.2d 310, 313 and n.2 (per Stevens, J.). *See United States v. Doughty,* 460 F.2d 1360, 1364 n.3 (7th Cir. 1972) (rejecting *Ivey* in favor of Second Circuit's position in *United States v. Mackiewicz,* 401 F.2d 219, 225 (2d Cir. 1968)).[4] The majority's holding that the marital privilege barring one spouse from testifying

---

**2.** At every point in the *Ivey* opinion, the court states that the issue presented there involved a claim of the privilege barring adverse testimony by one spouse against another. At no point does the *Ivey* opinion indicate a concern with the privilege for confidential interspousal communications.

**3.** The *Williams* court found *Ivey* indistinguishable from the case before it "unless it can be demonstrated that *since Sarah Williams was a charged* co-conspirator in the indictment the evidence was an admission against the interest of a co-conspirator admissible against the other conspirators." *United States v. Williams, supra,* 447 F.2d at 898. (Emphasis in original.) The court pretermitted consideration of that question holding that Mrs. Williams' statement was inadmissible hearsay since she was under arrest at the time she made it. Thus, while the *Williams* decision leaves open a question which might be decided as a *res nova* today, the *Williams* court definitely considered *Ivey* to have settled the question of the applicability of

the privilege to out-of-court statements in general. Today, the majority redetermines the settled question and casts *Ivey* aside. Since my disagreement is with the majority's per se approach to the applicability of the privilege to out-of-court statements and since I am convinced that any error in the admission of the statements was harmless, I do not find it necessary to address the question noted but left open in *Williams.* Neither do I find it necessary to consider whether the fact that Mr. Mendoza was present when his wife made certain of the challenged statements and failed to object to them constitutes an implied admission.

**4.** *United States v. Harper,* 450 F.2d 1032 (5th Cir. 1971) does contain a single sentence of dictum indicating that the privilege barring one spouse from testifying adversely to the other is inapplicable where the declarant does not testify at trial. *Id.* at 1045. Read in context, however, it is clear that *Harper* offers no support to the majority. The claim rejected in *Harper*

against another is inapplicable simply because Mrs. Mendoza did not testify against her husband at trial is flatly inconsistent with the prior case law of this circuit.

Although the challenged testimony further incriminated Arturo Mendoza, the husband, Mrs. Mendoza's statements against her husband were entirely cumulative and added nothing of significance to the overwhelming independent evidence of her husband's guilt. Agent Balazs also testified to a number of conversations with Arturo Mendoza in which Arturo Mendoza referred to the same land in Mexico and offered to arrange large sales of heroin and marijuana. Under the circumstances any error in admitting Mrs. Mendoza's statements was harmless.

One final point deserves clarification. The majority holds that the second marital privilege, that barring introduction of confidential interspousal communications, was not violated here since the confidential communications between Mr. and Mrs. Mendoza were both in furtherance and during the pendency of a criminal conspiracy. I agree with the majority that such communications ought not be privileged, but wish to emphasize that the confidential interspousal communication must itself occur during the pendency and be in furtherance of the joint criminal enterprise in order to lose its protected character. Here the only confidential interspousal communications introduced were the couple's discussions, as summarized by Mrs. Mendoza, regarding their plan for the Mexican curio shop. Obviously, Mrs. Mendoza's *report* of these conversations to Agent Balazs was not itself a confidential interspousal communication. While a finding that Mrs. Mendoza made this report in furtherance and during the pendency of a criminal conspiracy is a prerequisite to the admission of that report on hearsay grounds, Mr. Mendoza would still be privileged to exclude the evidence on the ground

that it disclosed the content of a confidential interspousal communication were it not for the fact that the interspousal communication was itself made in furtherance of and during the pendency of a criminal enterprise between the Mendozas. Again, it is the character of the interspousal communication which is decisive on the question of its protected character. *See United States v. Kahn*, 471 F.2d 191, 194–95 (7th Cir. 1972), *cert. denied*, 415 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973), *rev'd on other grounds*, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). The sensitivity and constitutionally protected status of marital privacy, moreover, require that courts applying the rule we pronounce today not indulge unduly elastic conceptions of a communication in furtherance of a criminal enterprise.

I have not hesitated to join in decisions which have denied claims of marital privilege when neither principle or precedent counsels exclusion. *See United States v. Cameron*, 556 F.2d 752, 755–56 (5th Cir. 1977); *United States v. Harper, supra.* I cannot, however, silently acquiesce in a decision which disregards the settled law of this circuit. Our prior cases make clear that the privilege barring one spouse from testifying adversely to the other is equally applicable to in-court and out-of-court declarations. Since the majority rejects this proposition, I cannot join in Judge Ainsworth's opinion. I concur in the affirmance of Arturo Mendoza's conviction because I am convinced that any error in the admission of Mrs. Mendoza's extra-judicial statements was harmless in view of the overwhelming independent evidence of Arturo Mendoza's guilt.

was that the government could not use the fruits of an extra-judicial investigation prompted by Mrs. Harper's out-of-court statement. The court specifically noted that the government did not attempt to introduce into evidence any out-of-court disclosures by Mrs. Harper. The only use by the government of Mrs. Har-

per's statements was in the extra-judicial investigation of the case. *Id.* at 1045. *Harper* is not authority for the proposition that the privilege barring testimony adverse to a spouse is applicable only when the declarant makes the statement in open court.