**REVISED, March 26, 1998**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 96-50384

_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

CLARENCE RAY MIKOLAJCZYK, et al.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Western District of Texas

_____
March 11, 1998

Before JONES and SMITH, Circuit Judges, and FITZWATER,[*] District Judge.

JERRY E. SMITH, Circuit Judge:


Appellants, convicted of mail fraud following a jury trial, raise several issues on appeal.  Finding no reversible error, we affirm.  In so doing, we find it necessary to discuss only a few issues and affirm on the remaining issues without discussion.


I.

Between October 1993 and May 1995, the defendants made several

_____

[*] District Judge of the Northern District of Texas, sitting by designation.

attempts to pass off fraudulent "Certified Money Orders" (CMO's) as legitimate money orders. The scheme was initiated by Billy Mack O'Neill and his partners in USA First, an alleged non-profit organization, who put together packets each containing six CMO's and information on how to use them. In exchange for the $300 price of the packet, buyers could write six CMO's, in any amount. Buyers were asked to provide almost no information upon receiving or using the CMO's, although most were asked for their name, and some gave their phone numbers.

The packets contained the following statement: "Warning. Just like the children's story about the emperor's new clothes, do not mention that your current credit money, the negotiable instrument, is pretend money. Only speak of the bank's negotiable instruments as being pretend money." It warned that the money orders would not "work for everyone" and that there was no "guarantee of a win against thieves and robbers dressed in bankers' or even judicial clothing."

The scheme apparently was designed to express dissatisfaction with the banking system and to obtain cash from buyers of the CMO's. In addition to the comment about thieves and robbers, the packet said "In God we trust, in banksters we bust!" and contained a cartoon about the banking system in which bankers stated, "With our system, it is easy to rob the people. All we have to do is lend paper credit and charge interest."

There is no indication that O'Neill, First USA, or the fictitious business they created under the name of O.M.B. W.D.

2

McCall ever intended to make payment on any of the CMO's. The instructions in the packet and on the CMO's required the individual who received a CMO as payment to send it to W.D. McCall's post office box. Upon receiving the CMO, First USA would send out a fake "Certified Banker's Cheque" (CBC). W.D. McCall never paid any of the obligations created by the CMO's.

The indictment named eight individuals: Billy O'Neill (who initiated the scheme), Michael Kearns, Earl Forrester, Wayne Slater, Vicki Slater, Patricia Koehler, Oliver Paulson and Clarence Mikolajczyk. Kearns, Forrester, and Paulson do not appeal their convictions. Except for the first count, which referred to the entire scheme of mailing fraudulent CMO's, each count of the indictment involved a separate incident in which a CMO was used. Several defendants used CMO's to purchase motor vehicles from individuals, using CMO's to pay off existing bank loans on those vehicles; others used the instruments to pay off credit card balances at various banks.

Appellants allege they were not aware that use of the CMO's was illegal. They claim they thought the CMO's were a credit-for-credit exchange. Their claim lacks support in the evidence, because they never provided financial information similar to that generally provided to a lending institution upon establishing a line of credit. Nor did they sign or receive any documentation about this alleged line of credit. Furthermore, the statements in the information packet strongly suggested the CMO's were not a legitimate form of payment.

Appellants' expert testified that these instruments were not intended to be used to obtain anything of new or current value, and that attempts to do so "come pretty close to fraud." He stated that with instruments like these CMO's, there should be full disclosure by the user of the fact that the CMO is backed by private money, so that the recipient can make a determination of its worth. Yet, none of the appellants disclosed any kind of credit-for-credit exchange.

## II.

### A.

Wayne Slater, Vicki Slater, and O'Neill (the "represented defendants") argue that they were prejudiced by the actions of their *pro se* codefendants, Koehler and Kearns, and did not have the opportunity for a fair trial. The defendants moved to sever on numerous occasions, but each request was denied. Their argument is plausible, but ultimately fails the strict requirements imposed by abuse-of-discretion review.

The rule that persons indicted together should be tried together carries great weight where, as here, persons are charged with committing the same conspiracy. *United States v. Archer*, 733 F.2d 354, 360 (5th Cir. 1984). Joinder is the rule rather than the exception, *United States v. Chagra*, 754 F.2d 1186, 1188 (5th Cir. 1985), and in fact, the defendants have failed to cite a single case in which this court reversed a conviction for failure to sever.

4

The denial of a motion to sever is reviewed only for abuse of discretion. *Zafiro v. United States*, 506 U.S. 534, 539 (1993); *United States v. Faulkner*, 17 F.3d 745, 758 (5th Cir. 1994). Reversal is warranted only when the defendant demonstrates that the denial resulted in compelling prejudice against which the trial court was unable to afford protection. *United States v. Thomas*, 12 F.3d 1350, 1363 (5th Cir. 1994).

## B.

The *pro se* defendants, Kearns and Koehler, argued that their conduct was not illegal. They asserted that the CBC's were "backed by liens," and they offered an expert witness who testified that this was an appropriate form of negotiable instrument. This line of defense differed substantially from that offered by the represented defendants, all of whom conceded that the CMO's were worthless instruments, but argued that they believed them to be legal tender.

In addition to their technical argument about the legality of CMO's, Kearns and Koehler attempted to justify their conduct by attacking the monetary system. Koehler complained in her opening statement that "I asked the United States Attorney to explain what he meant by money, and he wouldn't explain it to me." Kearns continued this line of defense when cross-examining Postal Inspector Butler, taking issue with Butler's characterization of the CMO's as "fraudulent" and asking questions about the definition of money and the value of federal reserve notes. Defendants'

5

attorneys observed that the jury found this line of defense irrelevant and annoying; one juror allegedly rolled her eyes every time Kearns spoke.

In addition, the *pro se* defendants may have alienated the jury through their hostile attitudes at trial. Kearns badgered Butler while he was on the stand, complaining that "it doesn't appear [Butler] knows too much," and "I'm asking you a simple question about your employer [(whether the Postal Service is a corporation)] and you don't even know the status." Kearns also accused Norman Summers, a former employee of USA First, of testifying "out of a vindictive heart." He asked Linda Hultgren, an employee of Capital One Financial Corporation, whether she was "looking to [the prosecutor] for him to answer the question for you." Objections to the argumentative nature of Kearns' questioning were made and sustained frequently during the part of the trial he attended.

Kearns did not limit his attacks to witnesses. He also interrupted the prosecutor's direct examination to tell the judge that a particular juror was asleep, an assertion the juror denied.

### C.

After six days of disruptive trial tactics, Kearns disappeared. Given his active participation in the early days of the trial, his absence was conspicuous. He was tried and convicted in absentia.

The Sixth Circuit has held that severance is particularly appropriate when the evidence against an absent codefendant is much

greater than that against a present defendant. *See United States v. Davidson*, 936 F.2d 856, 861 (6th Cir. 1991). We need not consider adopting that reasoning, however, because *Davidson* is distinguishable. There, the defendant tried in absentia was charged with ten counts, while his present codefendant was charged with only one. The court believed that Davidson was prejudiced by the introduction of an overwhelming amount of uncontested incriminating evidence, even if that flood of evidence pertained to his codefendant and not to himself.

Here, in contrast, while Kearns was named in more counts than were the other defendants, and the evidence of his guilt was slightly stronger, plenty of factual and legal issues remained for the other defendants to dispute. The jury was not overwhelmed with uncontested, incriminating evidence, but instead witnessed a normal trial in which the prosecutor's case received no rebuttal with respect to one of several nearly equivalent defendants. Finally, the district court gave an instruction designed to neutralize any negative effects of Kearns' departure on the jury's view of the case:

> Members of the jury, Michael Kearns is not with us. It appears that he has decided to voluntarily not continue to participate in the proceeding. So, I have decided that we will go forward with the trial without Mr. Kearns being here. The trial will continue as to all eight accused. The fact that Mr. Kearns has decided not to be present and participate any further should not be interpreted by you, in any way, as to effect [*sic*] or to prejudice any of the other people on trial. It should not affect you at all, in any way.

To the extent that Kearns's departure had an effect on the jury, this instruction was sufficient to protect the defendants from

7

compelling prejudice.

D.

Vicki Slater argues that the *pro se* defendants introduced evidence harmful to her that would not have been admissible by the prosecution. Specifically, Kearns invited the introduction of evidence about Slater's ownership of a gun by asking a Bank One representative why she did not have Slater's car repossessed. The witness replied that she "did not send a repo agent" because she knew that Slater owned guns. Slater's counsel's objection to this testimony was overruled.

Counsel then asked questions to demonstrate that Slater was a former police officer, that she hunted, and that gun ownership was not illegal. These questions presumably contradicted the implication that she was a dangerous and violent person and that the bank agent was afraid of her. The prosecution then asked the witness if she didn't send a repo agent because she didn't want to take a risk that the guns "might be anything more than . . . for hunting." Because evidence of Slater's gun ownership was already in the record, the introduction of this evidence did not rise to the level of compelling prejudice. *See United States v. Daly*, 756 F.2d 1076, 1081 (5th Cir. 1985).

E.

In *Daly*, this circuit found no compelling prejudice arising out of a codefendant's *pro se* representation. As in this case,

8

most of the *pro se* defendant's blunders were made out of the jury's presence.[1] 756 F.2d at 1080. Furthermore, the *Daly* court pointed out that in a long, complex trial, considerations of judicial economy require that defendants involved in related criminal conduct be tried together. 756 F.2d at 1080. The facts of the instant trial were complex, and several of the counts involved acts by both represented and unrepresented codefendants. Conducting two trials would have caused significant inconvenience to witnesses and duplicative use of court resources.

Judicial economy aside, the refusal to sever was not an abuse of discretion because the court used special instructions to ameliorate any prejudice. *See Daly*, 756 F.2d at 1081. The court instructed the jury to compartmentalize the evidence against each defendant on each count:

> A separate crime is charged against one or more of the defendants in each count of the indictment. Each count, and the evidence pertaining to it, should be considered separately. Also, the case of each of the defendants should be considered separately and individually. The fact that you may find one or more of the accused guilty or not guilty of any of the crimes should not control your verdict as to any other crime or any other defendant. You must give separate consideration to the evidence as to each defendant.

During voir dire and trial, the court gave additional instructions to consider the counts and defendants separately. Under the

---

[1] For instance, the *pro se* defendants proclaimed themselves sovereign citizens primarily at pre-trial motions. Forrester appeared in court and stated, "I'm a man on the land. I'm a sovereign citizen. And, further I say not." Similarly, Paulson demanded to see the prosecutor's identification because Paulson had been required to attend an "identity hearing." Even if the jury had heard these statements, however, a neutralizing instruction sufficiently would have ameliorated any prejudice.

circumstances, the court did not abuse its discretion in refusing to sever the trials.

## III.

Vicki Slater is the only defendant who presents a colorable case on sufficiency of the evidence, although her argument is more accurately characterized as claiming a constructive amendment of the indictment. She was indicted on only one substantive count, which involved a CMO she sent to Bank One.

The indictment, however, does not list Bank One as one of the several financial institutions defrauded by the conspiracy and by the specific acts. The facts describing Slater's substantive count state that the CMO was mailed to Bank One, and the acts alleged in the conspiracy count accurately describe her conduct, so there is no question of notice. Slater argues that notice is irrelevant because there was a constructive amendment of the grand jury indictment, and the amendment invalidates her conviction despite the full description of her conduct.

The government characterizes the claim as one of fatal variance between indictment and proof. Slater cannot succeed on this theory, because a defendant cannot receive relief for a variance unless it is material and prejudices his substantial rights. *See, e.g., United States v. Morgan*, 117 F.3d 849, 858 (5th Cir.), *cert. denied*, 118 S. Ct. 454 (1997). As long as the defendant receives notice and is not subject to a risk of double jeopardy, his substantial rights are not affected. *See, e.g.,*

10

*United States v. Berger*, 295 U.S. 78, 83 (1935). Because the conspiracy count accurately described the conduct, and the substantive count stated the date and the fact that Bank One was involved, there was no problem with notice, and double jeopardy could not occur.

Slater urges us to apply the more stringent rule for constructive amendments: Where a constructive amendment has occurred, the conviction cannot stand; there is no prejudice requirement. *See, e.g., United States v. Salinas*, 654 F.2d 319 (5th Cir. 1981), *overruled on other grounds by United States v. Adamson*, 700 F.2d 953 (5th Cir. 1983) (en banc). This argument fails, too, because a constructive amendment cannot occur where the indictment completely and accurately describes the conduct, so that the grand jury is not misled about the basis for the indictment.

This criterion distinguishes the cases Slater cites from her own. In *Salinas*, the case most closely analogous, the defendant was charged with conspiring to defraud a bank. The indictment alleged that he conspired with the bank's president. The evidence showed, however, that the defendant had conspired with the executive vice president. We reversed, holding as follows:

> The mistake in the particular name of the officer involved is not like a variance in a date or place. The appellant was not formally charged with theft. The indictment said in effect that Woodul stole and that the appellant helped. Once it is shown that the named principal did not steal, it begins to look like the appellant was convicted of a crime different from that of which he was accused.

*Salinas*, 654 F.2d at 324-25.

11

In *Salinas*, the indictment did not even mention the name of the real principal. Therefore, the grand jury easily could have been misled as to the crime with which it charged the defendant. Here, in contrast, the indictment makes plain what Slater did, and the grand jury probably did not even notice the omission of Bank One from the list of victims.

Other cases applying the doctrine of constructive amendment detract further from Slater's argument. For instance, she cites *United States v. Mucciante*, 21 F.3d 1228, 1235 (2d Cir. 1994), in which the defendant alleged that the government charged him as a principal, but instructed the jury to find him liable as an aider and abettor. Not only would such a change be easily distinguishable from this case, but Mucciante's claim was rejected. Slater also cites *United States v. Doucet*, 994 F.2d 169, 173 (5th Cir. 1993), in which we reversed on the ground that the prosecution had obtained an indictment for possession of an unregistered machine gun, but finally asked the jury to convict for possession of individual *parts* that could be *assembled* into a shotgun. This allowed the defendant to be convicted on grounds broader than those stated in the indictment.

Such a situation raises the possibility that both the grand jury and the defense were misled about the material elements of the crime, so that the grand jury might have mistakenly indicted, and the defense was unable to prepare an effective defense. Here, in contrast, the indictment contained a drafting error that confused and prejudiced no one. While Slater is correct that the

12

constructive amendment rule does not require a showing of prejudice, prejudice is inherent in the concept of constructive amendment: If the amendment contained an accurate description of the crime, and that crime was prosecuted at trial, there is no constructive amendment.

IV.

Vicki Slater also challenges the admission of allegedly irrelevant evidence of past acts. Because this is a criminal case, evidentiary rulings are reviewed under a heightened abuse of discretion standard. *United States v. Carrillo*, 981 F.2d 772, 774 (5th Cir. 1993). Evidence in criminal trials must be "strictly relevant to the particular offense charged." *United States v. Hays*, 872 F.2d 582, 587 (5th Cir. 1989). We must take into account "what effect the error had or reasonably may be taken to have had upon the jury's decision." *Hays*, 872 F.2d at 587 (citing *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)).

All of the evidence whose admissibility is contested was evidence of past acts used to cross-examine the defendant. Importantly, FED. R. EVID. 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

A defendant makes his character an issue, losing the protection of rule 404(b), when he testifies. *United States v. Tomblin*, 46 F.3d 1369, 1388 (5th Cir. 1995). This does not give the prosecution

13

free rein, but allows it to cross-examine him with respect to "instances of misconduct that are 'clearly probative of truthfulness or untruthfulness,' such as perjury, fraud, swindling, forgery, bribery, and embezzlement." *Id.* at 1389 (citing *United States v. Leake*, 642 F.2d 715, 718 (4th Cir. 1981)).

Slater argues that the court erred in admitting evidence that she had filed a public notice "rescinding" her tax returns. Objections to the introduction of this testimony were initially sustained, but when Slater took the stand to testify to her own good faith, the judge allowed the prosecution to cross-examine her about it. The government defends this decision on the ground that the CMO's were arguably also a form of "protest" activity, so the tax protest evidence was relevant to her "state of mindSSknowledge, intent and motive."

Slater's past protest activity does not fall within the category of past acts that may be used to impugn a defendant's credibility on cross-examination. It involved no fraud and no illegal activity, and therefore falls far short of the "clearly probative of truthfulness or untruthfulness" test we apply. The government does not allege that the evidence directly contradicted an issue raised in Slater's direct examination, and the evidence cannot do so, because Slater's past lawful protest has, at best, a tenuous relationship to her good faith in using the CMO's.

The evidence does not actually relate to Slater's state of mind at the time she allegedly committed the crime, either. It is not relevant to her "knowledge" whether the CMO's were valid. The

14

government argues that it is relevant to her motive and intent, because it suggests she had a motive or intent to protest the monetary system. The past protest has only slight relevance on this issue.

Slater emphasizes the fact that her past protest was lawful, while the CMO scheme was unlawful. Furthermore, however, the government offered no evidence suggesting that Slater had a protest motive when she used the CMO's. The only evidence on this was the statements in the CMO packets, which Slater did not prepare.

The only possible effect of the past protest evidence would be to suggest a protest motive in the use of the CMO's that the evidence did not already put at issue. Slater claims that labeling her a "protester" unfairly associated her with Kearns and Koehler, self-proclaimed "sovereigns" who would be viewed by the jury as terrorist lunatics. While this argument is farfetched, her conclusion that the evidence might have had a "guilt by association" effect, suggesting that she had a motive that could otherwise have been attributed only to the instigators of the scheme, is plausible.

Nevertheless, we deny Slater's request for a new trial, because the error was harmless. *See United States v. Polk*, 56 F.3d 613, 629 (5th Cir. 1995); *United States v. Heller*, 625 F.2d 594, 599 (5th Cir. 1980). She did not contest the evidence that she attempted to pay off her car loan with a CMO, demanded that her loan balance be brought to zero, and refused to offer legitimate payment or turn over the car when asked. These are not the actions

15

of an innocent victim. If, as she alleges, Slater thought the CMO's were valid and had no intent to defraud anyone, she would not have attempted to avoid her loan obligations once she discovered that the CMO's were worthless.

Furthermore, the prejudicial effect of the evidence was slight. While it did suggest a protest motive not convincingly demonstrated by the evidence, it was not the kind of inflammatory evidence that could get an overly emotional response from the jurors. Nor was it similar enough to the crime charged that the jury was likely to conclude, improperly, that the commission of the prior act implied commission of the current act. Under these circumstances, we are "sure, after viewing the entire record, that the error did not influence the jury or had a very slight effect on its verdict." *Heller*, 625 F.2d at 599 (citing *United States v. Underwood*, 588 F.2d 1073, 1076 (5th Cir. 1979)).

V.

Koehler contests the amount of restitution to which she was sentenced. She claims she should not have to pay $27,192.51 to the Ford Motor Credit Company, because the amount includes compensation for consequential damages not properly recoverable under the Victim and Witness Protection Act (VWPA). Specifically, Koehler contests restitution for the legal expenses incurred by Ford to defend a lawsuit that Kearns had brought after he tried to pay off a car loan with a CMO and Ford, unable to obtain payment on the CMO, repossessed the vehicle. Ford incurred over $20,000 in legal fees

16

defending the suit.

The VWPA does not generally authorize recovery of legal fees expended to recover stolen property. *See United States v. Mitchell*, 876 F.2d 1178, 1184 (1989). This limitation is derived from 18 U.S.C. § 3663 (1985), the relevant portion of which reads as follows:

(b) The order may require that such defendant§§

(1) in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense§§

(A) return the property to the owner of the property or someone designated by the owner, or

(B) if return of the property under subparagraph (A) is impossible, impractical, or inadequate, pay an amount equal to the greater of§§

    (i) the value of the property on the date of the damage, loss, or destruction, or

    (ii) the value of the property on the date of the sentencing,

less the value (as of the date the property is returned) of any part of the property that is returned. . . .

Because this is a case involving "loss" of property "of a victim of the offense," the statute authorizes the return of the property or of its value. In *Mitchell*, we held that the plain language of the statute did not authorize the "cost of employing counsel to recover from an insurance company." 876 F.2d at 1184. Ford's costs of recovering the Explorer, such as the wages of its repo man or, hypothetically, the cost of a lawsuit to recover the car, would not be recoverable by analogy to the situation in *Mitchell*; such costs are merely consequential damages that would

17

not be recoverable as damages in a lawsuit and, similarly, are not recoverable as restitution.

The legal costs incurred by Ford are not analogous to those incurred by the victims in *Mitchell* or to the typical costs of a lawsuit to recover property. In *Hughey v. United States*, 495 U.S. 411, 412 (1990), the Court held, in interpreting § 3663, that restitution can be awarded only for "the loss caused by the specific offense that is the basis of the conviction." Here, Kearns's action of bringing a lawsuit against Ford was part of the scheme to defraud, the offense that is the basis of Koehler's conspiracy conviction.[2] Ford's costs of defending the lawsuit were a direct and mandatory result of Kearns's act in furtherance of the conspiracy, not a voluntary action taken by Ford to recover property or damages from Kearns, Koehler, or a third party.

VI.

Mikolajczyk alleges that his counsel provided ineffective assistance at trial and on appeal. He did not raise this argument before the district court. We generally do not review claims of ineffective assistance that have not been raised before the district court, because there has been no opportunity to develop and include in the record evidence bearing on the merits of the allegation. *See, e.g., United States v. Foy*, 28 F.3d 464, 476 (5th

---

[2] The fact that Kearns, rather than Koehler, brought the suit does not matter, because Koehler can be required to pay restitution for all acts taken in furtherance of the scheme to defraud of which she was convicted. *See United States v. Stouffer*, 986 F.2d 916, 928 (5th Cir. 1993); *United States v. Ismoila*, 100 F.3d 380, 398 (5th Cir.), *cert. denied*, 117 S. Ct. 1858 (1996).

18

Cir. 1994). The typical procedure is to dismiss without prejudice to a subsequent § 2255 motion. *Id.* Mikolajczyk's claim of ineffective assistance at trial cannot be reviewed, because the record is not well developed on this issue.

Mikolajczyk also complains of ineffective representation on appeal, because he was appointed standby counsel, but counsel made no effort to contact him. For the same reason that we decline to consider the claim of ineffective assistance at trial, we must pretermit consideration of this issue too, and allow it to be raised in a § 2255 motion once the outcome of the appeal is known.

Were we to consider Mikolajczyk's claim, however, his case would be weak. This court has held that a defendant's statutory right to choose *pro se* or attorney representation is "disjunctive"; a defendant has a right to one or the other, but not a combination of the two. *United States v. Daniels*, 572 F.2d 535, 540 (5th Cir. 1978). Mikolajczyk was constitutionally guaranteed the right to represent himself if he so chose, or to receive competent representation from an attorney, but the availability of standby counsel to provide a combination of the two was not constitutionally required. If Mikolajczyk had no right to standby counsel, it seems unlikely that standby counsel's failure to assist could be a violation of his Sixth Amendment rights.[3]

---

[3] Furthermore, Mikolajczyk complains only that his standby counsel never contacted him. He does not allege that he made any attempt to contact standby counsel, despite the fact that standby counsel exists primarily to help the *pro se* litigant *upon request*. "The Court may appoint . . .'standby counsel' to aid the accused if and when the accused requests help. . . ." *Faretta v. California*, 95 S. Ct. 2525, 2540 (1975), *citing United States v. Dougherty*, 473 F.2d 1113, 1124-26 (D.C. Ct. App. 1972). We have no evidence that

(continued...)

19

AFFIRMED.

---

(...continued)
Mikolajczyk made such a request or was prevented from making one.

20